UNITED STATES, Appellee,

v.

Leon B. REDMOND, Specialist Four
U.S. Army, Appellant.

No. 50755.
CM 443157.

U.S. Court of Military Appeals.

Feb. 3, 1986.

For Appellant: *Captain Richard J. Anderson* (argued); *Colonel William G. Eckhardt, Lieutenant Colonel William P. Heaston, Major Lawrence F. Klar, Captain Robert W. Wiechering* (on brief); *Colonel Brooks B. LaGrua, Lieutenant Colonel Arthur L. Hunt, Major John E. King, Major Stephen R. Dooley, Captain Frank J. DiGiammarino.*

For Appellee: *Captain Richard G. Mann, Jr.* (argued); *Colonel James Kucera, Lieutenant Colonel Adrian J. Gravelle, Major Larry D. Williams* (on brief).

*Opinion of the Court*

EVERETT, Chief Judge:

Specialist Four Leon B. Redmond was tried at Bad Kreuznach, Federal Republic of Germany, before a general court-martial composed of officer members, on February 24 and March 1–5, 1982. Contrary to his pleas, he was found guilty of premeditated

murder, in violation of Article 118 of the Uniform Code of Military Justice, 10 U.S.C. § 918.[1] The court sentenced him to a dishonorable discharge, forfeiture of all pay and allowances, reduction to the lowest enlisted grade, and to be put to death. The convening authority approved the findings and sentence. On August 14, 1984, the Court of Military Review in a *per curiam* opinion affirmed the findings of guilty but reduced the death penalty to confinement at hard labor for life because the sentencing procedure followed in his case was constitutionally defective.[2] We granted review to consider these issues:

I

WHETHER THE PERMISSIBLE INFERENCE THAT ONE INTENDS THE NATURAL CONSEQUENCES OF HIS ACTIONS IS INSUFFICIENT AS A MATTER OF LAW, STANDING ALONE, TO ESTABLISH A SPECIFIC INTENT TO KILL IN THE FACE OF TESTIMONY FROM MEDICAL EXPERTS THAT SUCH AN INTENT WAS ABSENT.

II

WHETHER THE ADMISSION OF THE DISEMBODIED SKULL OF THE VICTIM, WHICH THE RECORD REVEALS WAS OF MINIMAL MARGINAL RELEVANCE AND OFFERED PRIMARILY FOR ITS INFLAMMATORY EFFECT, WAS AN ABUSE OF DISCRETION WHICH MATERIALLY PREJUDICED THE SUBSTANTIAL RIGHTS OF THE ACCUSED.

I

A. *Chronological Narrative*

In mid July, 1981, Private Maurice Crosby introduced his 18-year-old fiancee, Ilona

Wietrzychowski, to appellant. At that time, appellant had remarked with reference to Ilona, "I'd like to get a piece of that." A week later, just before midnight on July 22, Redmond and his girl friend, Private First Class Kathleen Rodgers—who was then five-months pregnant with his child—encountered Crosby, Ilona, and Specialist Four William Henry at the Club Romantik, a bar in Bad Kreuznach.

Appellant suggested that they go somewhere to "smoke some hash"; and so they left the bar shortly after midnight and drove away in his yellow Renault. After the group had driven for about an hour, Redmond stopped the car at a dirt road; and he and Crosby got out to urinate. According to Crosby, appellant "was a little irritated" that Henry had come with them; and he stated that he would drive the group back to Bad Kreuznach. During the ride back, Crosby and Ilona fell asleep in the back seat.

After reaching Bad Kreuznach, at about 1:20 a.m., appellant first dropped off his girl friend, Rodgers, at her billets. He told her that he would return to her by 2:00 a.m. Then Redmond drove to another barracks and dropped off Crosby and Henry. Because Crosby was somewhat intoxicated and tired, he left Ilona alone in the car with Redmond, whom he told to "make sure she" got "home safely." Her home was five to eight minutes away by car. Crosby never saw his fiancee again.

At 2:26 a.m., Redmond appeared at the room of his girl friend, PFC Rodgers. He "was covered with blood .... It was all over-all over his face, his arms, his clothes." At Redmond's request the two left the room and went to his car. There, Rodgers observed that the front passen-

---

1. As an alternative charge to premeditated murder, Private First Class Kathleen Rodgers was named as the principal and Redmond was charged with preventing her apprehension and trial by assisting her in hiding the victim's body and in helping her to dispose of certain material evidence of the murder, in violation of Article 78, Uniform Code of Military Justice, 10 U.S.C. § 878. However, after the prosecution present-

ed its case on the merits, it elected to proceed against appellant only on the original premeditated murder charge, and this charge was dismissed by the military judge.

2. *See United States v. Matthews,* 16 M.J. 354 (C.M.A.1983).

ger's seat was "laying down" and contained a bloody blanket on which a hammer rested. Rodgers asked appellant what had happened; and he replied that he had "killed a white guy and a black lady" and had "dropped . . . off" their bodies "outside of Bad Kreuznach somewhere." When Rodgers asked whether "he [had] use[d] the hammer to kill'em with," Redmond replied, "Yes, that's why there's so much blood." Rodgers saw Ilona's sunglasses and asked appellant if, in fact, he had killed Ilona and Crosby; but Redmond denied this. Pursuant to his orders, she "threw . . . [the sunglasses] out the window."

They drove past Frankfurt and stopped in a wheat field. There, Redmond pulled a brown bag from the back of his car, "took some soap and a wash cloth out of" the bag, washed himself in a puddle of water, and put on some clean fatigues. Also changing clothes, Rodgers "put on a pair of" appellant's "red pants and a brown and white sweater." After wiping off the hammer, appellant threw it and the bloody blanket in the field. According to Rodgers, the bloody clothes were not discarded there because Redmond stated that "he didn't want to put all the evidence together." Instead, enroute back to Bad Kreuznach, Rodgers deposited the clothes in a garbage dumpster.

After the pair returned early in the morning to Bad Kreuznach, Redmond stopped at his barracks to determine when he was scheduled to perform duty that day. While he was out of the car, Rodgers noticed a red handbag. Appellant told her that it belonged to "[t]he black female . . . he had killed"; but, in fact, it belonged to Ilona. Appellant instructed Rodgers to place the handbag in her locker, and he stated that he would "get rid of it later."

Appellant left "to sign in for . . . [an] alert"; and Rodgers "went back to . . . [her] room . . . to sleep." At about 7:30 a.m., she was awakened by Redmond's knocking on her door. Then, according to Rodgers, he asked, "Are you going to clean the car out or do you want me to get caught?"

While Rodgers was cleaning his car, appellant, a heavy truck driver, drove his scheduled route. On his return at 9:00 a.m., he reported that his truck's alternator was discharging. Appellant's squad leader thought he was unusually nervous and upset. Soon Redmond disappeared for the rest of the workday.

That same day Specialist Four Henry learned that Ilona had not come home from her outing the night before and that her mother was looking for her. The next day, Friday, he encountered Crosby and informed him that Ilona had not "been home in two days." Crosby became immediately concerned and talked to appellant, who reported "that he had dropped" Ilona "off in front of" a restaurant near the Bad Kreuznach train station. There, she met a man with whom she argued; and finally the two had driven away in a car. Appellant also told Crosby that he had picked up Rodgers before leaving Ilona.

Subsequently, Crosby asked Rodgers if Ilona had been in the car when appellant picked her up. Receiving a negative answer, Crosby accosted Redmond again and received a new and different version of events.

Late on the afternoon of July 24, Ilona's body was discovered lying facedown in a vineyard at the edge of a grass-covered farm road and 115 meters from a main paved road. Someone had smashed the back of her head and fractured her skull. The body was fully clothed; but her blood stained jacket was about 20 meters away. The spiked heel shoes which Ilona had been wearing were soiled with dirt from the scene. In addition to a severe skull fracture and the crushing of the left side of her brain, Ilona had sustained contusions on her left eye, right cheekbone, left shoulder blade, torso and knees, a fracture of the middle finger of her right hand, a tear on the right ear lobe, injuries to her lips, and miscellaneous abrasions and bruises.

During the subsequent investigation by German police and Army Criminal Investigative Division personnel, examination of appellant's automobile disclosed visible

blood spots on the rear portion of the passenger seat and around the radio and left rear door beam; and throughout the car other blood traces were detected by chemical means. The blood spots were of the AB human blood type. Ilona had this blood type, which is comparatively rare and found in only five to six percent of the population in that part of Germany. Redmond and Rodgers had blood type O. Fingernail scrapings obtained from appellant's right hand disclosed traces of human blood on the thumb and two fingers; but the traces were too small for serological analysis.

Appellant gave German and American investigators a variety of accounts of his activities on the night of the homicide. One statement by him was so unchivalrous as to accuse Rodgers of the slaying. On another occasion, however, Redmond admitted that he had killed Ilona with a hammer that was in the car.

Herr Weiland, a German police official, gave his opinion that Ilona initially had been injured in the car—which accounted for the blood found there. She was still alive when she was in the field—as indicated by the location of "brain particles . . . next to the corpse" and by bloodstains on her face. She was killed while "lying down or bent over" at the same place where her body was found.

In the opinion of Dr. Eckhard Hohmann, a German forensic pathologist, the time of death was more than 36 hours before he performed an autopsy at 9:30 p.m. on July 24. The blows "must have" been struck "from behind"—probably while the victim was lying on soft ground or some other soft surface. Ilona's injuries were consistent with her being held down while being struck. The injuries to her hands were apparently received when she tried to defend herself. Because of the Renault's small size, it was "highly unlikely" that all of Ilona's injuries could have been inflicted while she was in the car.

### B. *Redmond's Mental Condition*

At trial the defense relied chiefly on evidence concerning appellant's mental condition. Lieutenant Colonel Arthur Campbell, a psychiatrist, had observed Redmond for approximately a week in December 1981. His diagnosis was that appellant had "a personality disorder, best called a borderline character disorder." "In lay terms, probably the best description is that these people are—that they have a stable instability; they have a life long pattern of either anger, eruptions of rage, depression, loneliness, a poor sense of identity—terrifically difficult interpersonal relations." Redmond could differentiate right from wrong and adhere to the right; and "he did not have any condition or defect that it would undermine that capacity." "I'd say that periodically, for whatever reasons, he becomes consumed with rage, and as a result of that erupts in violent behavior." Redmond had said he did not remember the offense; but, aside from his own statement, there was no other evidence of memory disturbance. Appellant "would not have any specific goals for" his rage "[e]xcept to hurt. I don't think he had a goal to kill."

Captain Allen Hopewell, a psychologist, had administered tests to appellant. In his opinion, Redmond fell within the "specific diagnostic category" of "borderline personality"—which "is not normally thought to be a mental disease or mental defect." Persons in this group "manifest numerous symptoms from different areas, but when we follow them long enough and look at them closely enough no one symptom really predominates and so they're not put into a category, such as schizophrenia." Redmond is "an individual that gets angry extremely easily."

I really do believe that he is a fellow that becomes easily angered and perhaps explosive, and doesn't have much control over that. However, in qualifying that, I think that he again is in touch enough with reality that he is responsible for his own behavior, and he—this in no way disqualifies him from being basically responsible for his actions; or means to imply that he should not be held respon-

sible for things that he does when he gets angry.

However, "a lot of his behavior, whether it's aggressive or non-aggressive behavior, is lacking—lacks somewhat of a specific goal." "I think he's a fairly unreliable person, both in what he does and what he says." In Dr. Hopewell's view, "multiple personality" was not "an appropriate diagnosis" for appellant. Redmond "probably does have brief periods of psychotic type of thinking or behavior"; and "when he's in this situation," "I would doubt" that he is "capable-of forming specific intent."

Major Clyde R. Snyder, a psychiatrist, had observed Redmond in September and November, 1981. In his opinion appellant suffered from "paranoid schizophrenia." However, it was "possible" that "the symptoms" he had "diagnosed as schizophrenia, could have actually been a borderline personality disorder."

Dr. Harry Chovnik, another psychiatrist, had six or seven "extended interviews" with Redmond—including a sodium amytal interview. He tentatively diagnosed appellant as suffering from a "multiple personality," which "is a rare disorder."

Lieutenant Colonel Roger Natkin, Chief of the Out-patient Psychiatric Department at the Frankfurt Army Medical Center, had also observed Redmond. His "[c]linical diagnosis was a ... borderline personality disorder ... with paranoid and explosive characteristics." This is not "a mental disease or defect" "in the terms of the legal definition." Appellant maintained that he could not remember the homicide, but no clinical reason had been found for this lack of memory. A person "in an explosive or paranoid episode" probably could not "conform their actions to the requirements of law." He had "no knowledge of whether Specialist Redmond had a dissociative episode on" July 22—chiefly because appellant denied having a recollection of the events.

Dr. James McCurdy, Chief of the Department of Psychiatry at the Frankfurt Army Medical Center, evaluated appellant and diagnosed a "borderline personality disorder" with "traits of explosiveness and paranoid ideation." "Basically, he has the personality traits of, with little provocation or little stimulus, to fly into explosive episodes, rage episodes, angry episodes, and act out that in some type of behavior." While "in one of these episodes," Redmond "[b]asically [would] not" be "able to conform his conduct to the requirements of law." Redmond "does not suffer from a mental disease or defect"; and this witness had "no idea ... whether he had an explosive episode on" July 22 because appellant "has no memory of that episode." No clinical reason could be found for this memory loss.

As a rebuttal witness, the Government called Major Thomas McIlwain, a psychiatrist who had seen appellant at the Army hospital in Bad Kreuznach on July 22, 1981 —the same day on which the fatal events occurred. Appellant reported

> having significant difficulties sleeping; that he'd become quite anxious. The reason for this was that he reported having been a CID informant prior to his arrival in Bad Kreuznach—in Karlsruhe or Heilbronn, somewhere in that region—and had been transferred here under a threat to his life. He said that he had been an informant for the CID in drug related cases and that, following his transfer here, individuals had learned of his contact with the CID and were making threats against his life, were throwing stones at him as he walked around post at night—here on Rose Barracks—and he was afraid that he might lose control at that time.

However, Redmond "manifested no evidence of any significant psychiatric disorder—a psychosis or depression"; and "he did not appear to be paranoid in any way." Dr. McIlwain observed no "indications of paranoid schizophrenia," "multiple personality," or psychosis. He doubted "that an individual's psychotic state ... could abruptly begin and abruptly end in such a way that a crime could be committed in between—in a psychotic state in between

two periods of clearly non-psychotic states."

Private First Class Kathleen Rodgers, recalled as a rebuttal witness, testified that two or three days after the murder she had taken a ride with appellant and some investigators "trying to search for the scene of the crime." Redmond directed them to a place where he and Crosby had gotten out of the car to urinate on the night of July 22. At that time, "[h]e leaned up over the seat and he said, 'Girl, don't you know if I'd have told them where I dropped the bodies off that they'd say I wasn't crazy?' "

Staff Sergeant Herbert Barrett, another rebuttal witness, testified that, as appellant's squad leader, he had not "notice[d] anything bizarre about ... Redmond." First Sergeant Donald Redman, who had been appellant's first sergeant, characterized him as a good soldier and had never "notice[d] anything unusual about his behavior." However, Sergeant Wesley Weddington, a defense witness in surrebuttal, had observed two occasions on which Redmond had suddenly and without reason displayed screaming rage.

## II

■ The phrasing of the first issue granted in this case is somewhat misleading, for it suggests that the Government relied *only* on an inference to establish a specific intent to kill and that medical experts testified this intent was absent. In fact, the expert testimony did not clearly demonstrate a lack of specific intent; and, besides any inference arising from the proof that appellant had smashed Ilona's skull with a hammer, there was ample circumstantial evidence of his intent to kill.

The physical evidence at the scene of the crime indicated that the victim had been assaulted both inside and outside appellant's car. Plenty of dirt had been found on the victim's shoes; and if Ilona had been dead when Redmond pulled her out of the car, it is unlikely that her high-heeled shoes would have been so heavily soiled with dirt—one spiked heel had up to six centimeters of dirt on it. In light of Ilona's dirty shoes, the location of her jacket on the ground nearby, and various minor injuries on her body, it appears that at some time after being attacked in the car, Ilona had been standing outside in the field before her skull was smashed.

The presence of small pieces of skull and brain particles next to the corpse, the pattern of dried blood on Ilona's head and face, and the other wounds on her body indicate that her skull was smashed by Redmond as he held his struggling victim face down on the ground in a secluded, rural vineyard over 100 meters from the main road. The force of the blows was reflected in the extensive damage to Ilona's skull. The location of the parts of the body to which the blows were directed, as well as the number of blows and the manner of their administration, tend to show that at the time Redmond had intended to kill his victim.

Appellant's attempts to conceal Ilona's body and his deliberate and continuing efforts to dispose of the evidence are further indications of a calculated purpose. The fact that Redmond constantly changed his story of events makes it more difficult to believe that he initially did not intend to kill Ilona.

With respect to appellant's state of mind at the time of the killing, the only evidence that he had been in a state of uncontrollable rage is contained in one of several conflicting pretrial statements. According to his oral admission to Special Agent Harliss Stone, Ilona had slapped him while they were riding in the car and had told him that he was "just like all the rest," and he had reacted by hitting her with the hammer and later pushing her body out of the car. However, his statement to Stone regarding Ilona's actions is uncorroborated; and, at one point Agent Stone thought Redmond was faking that something was mentally wrong with himself. Redmond's remarks to PFC Rodgers also intimated that he was pretending to be insane. Interestingly, no clinical reason could be found by the psy-

chiatrists for Redmond's purported amnesia as to the killing.

In light of common sense, knowledge, and observation, a factfinder could reasonably have concluded that Redmond—who had appeared sane to a psychiatrist a few hours before the homicide; who had the presence of mind to dispose of the evidence immediately after the murder; who possessed enough cunning and cleverness to concoct several false alibis and to point the finger of blame at others; who had a record as an outstanding soldier; who had exhibited no bizarre or unusual conduct; and who got along well with others before the killing occurred—was sane and capable of premeditating at the time he smashed Ilona's skull. Moreover, there was even expert testimony that lying about a crime and trying to cover it up is inconsistent with the behavior of psychotic and insane persons and that a psychotic state could not have come and gone during the brief time that Redmond was alone with Ilona.

As we read the record—and contrary to the impression created by the language of the granted issue—the psychiatrists did not testify that in their opinion appellant lacked premeditation or the ability to premeditate when he killed Ilona. However, regardless of what these experts meant to say, the members were not required to accept their testimony and ignore the compelling circumstantial evidence in the case. *See* paras. 120(c) and 122(a), and Mil.R. Evid. 703, Manual for Courts-Martial, United States, 1969 (Revised edition). Indeed, it was for the members to consider *all* the evidence, including opinion and circumstantial evidence, in determining whether appellant had premeditated Ilona's death. Apparently they gave this consideration and concluded that appellant was guilty of premeditated—not unpremeditated—murder.

In reaching their conclusion, the members were properly advised by the military judge. He informed them in great detail on the issue of insanity and partial mental responsibility—in relation to both the capacity to have a premeditated design to kill and the capacity to entertain a specific intent to kill or inflict great bodily harm. Furthermore, his instructions about a permissive inference as to intent seem to accord fully with the requirements of *Francis v. Franklin*, —— U.S. ——, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985).

### III

During the case-in-chief, trial counsel offered in evidence the murder victim's skull, which had been reconstructed by a German pathologist. Moreover, he offered three photographs of the victim's body which were taken after the body had been brought into the autopsy room. Defense counsel objected to two of the photographs as being unduly prejudicial and cumulative with other exhibits. Similarly, he objected to admission of the skull on the grounds that it was unduly prejudicial under Mil.R. Evid. 403 and was cumulative with other government exhibits.

However, the prosecutor contended that the probative value of the skull outweighed any inflammatory or prejudicial effect because, by showing the ferocity of the attack, the substantial number of blows, and the probable weapon used, it helped establish premeditation by appellant. Trial counsel also asserted that the skull and the autopsy photographs would aid the pathologist in his testimony.

The military judge admitted the skull and two of the three photographs into evidence; but he ruled that the court members could not take the skull exhibit into the deliberation room or handle it. Thereafter, Dr. Hohmann used these exhibits to illustrate his testimony. He claimed that the reconstruction of the skull aided him in arriving at his opinion but acknowledged that it had not helped him as much as he had hoped.

On this appeal, appellant again contends that the skull constituted inflammatory evidence, which, at best, had little probative value. He then submits that "[w]here the evidence of premeditation was otherwise nonexistent, substantial prejudice is apparent."

The law is settled that a prosecutor should not attempt to excite the passions of factfinders by evidence which, even if otherwise admissible, is unduly inflammatory; and such evidence should "be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ... or needless presentation of cumulative evidence." Mil.R.Evid. 403. Even so, the military judge has wide discretion in determining admissibility of such evidence; and absent a clear abuse of discretion, his determination to admit the evidence will not be disturbed on appeal. *United States v. Naranjo*, 710 F.2d 1465, 1468–69 (10th Cir.1983); *United States v. McRae*, 593 F.2d 700, 707 (5th Cir.), *cert. denied*, 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979).

We are unable to find an abuse of discretion by this military judge in admitting the skull into evidence. As trial counsel contended, this exhibit could properly be used to show the ferocious nature of the attack and thereby, indirectly, to establish premeditation.

The skull helped establish other important facts about the circumstances of the murder. The left rear portion of the deceased's skull had been broken into so many pieces that it was necessary for the pathologist to staple the pieces together in order to have a more or less complete skull. This circumstance refuted appellant's claim in one of his earlier pretrial statements that he had merely struck the decedent once with the hammer in the car—as a sort of spontaneous reaction to her insulting remarks. Furthermore, the skull and photographs assisted the German pathologist—who testified through an interpreter—in illustrating why, during his autopsy, he had arrived at certain conclusions as to how Ilona was killed.

Even if the skull should not have been admitted into evidence, we can hardly believe that the experienced officers who sat on the court-martial would have been significantly influenced by it—especially in their determination as to guilt and innocence. There was substantial circumstantial evidence that appellant had deliberately committed this murder. Moreover, other photographs of the victim's body to which appellant did not object were equally gruesome; and the skull was not with the court members when they deliberated.

If the exhibit affected anything, it was the sentence. However, appellant's death sentence was subsequently reduced to confinement for life; and life imprisonment is the minimum sentence authorized for premeditated murder. Art. 118. Therefore, if Redmond were prejudiced as to the sentence, this prejudice has clearly been eliminated.

## IV

The decision of the United States Army Court of Military Review is affirmed.

Judge COX concurs.