UNITED STATES, Appellee,

v.

Roland R. HINES, Staff Sergeant U.S. Air Force, Appellant.

No. 50,825.
ACM 24002.

U.S. Court of Military Appeals.

Dec. 22, 1986.

committing a lewd act upon the 18–year-old.

During the ensuing days, Mrs. Hines and the girls made a series of oral statements to a law-enforcement agent. These statements, which detailed a lengthy history of sexual misconduct directed against the girls, were subsequently reduced to writing and signed upon oath. Appellant also made a series of confessions, both written and oral, in which he admitted the majority of the conduct alleged by the girls. In addition, the witnesses' statements were corroborated by independent evidence of Mrs. Hines' excited utterances upon her discovery and by the statement of one of the girls to a social worker.

Notwithstanding Mrs. Hines' initial shock and anger against appellant and the initial willingness of all three witnesses to cooperate with law-enforcement officials and discuss the events, by the time of appellant's trial, neither Mrs. Hines nor the daughters were willing to testify against appellant. In the interim, a rapid and apparently successful process of understanding, forgiveness, and reconciliation between the family members seems to have occurred.[3]

Despite reluctance on the part of the witnesses to testify, the prosecution managed to produce all three witnesses at the trial. Each, in succession, emphatically refused to testify on the grounds that their testimony might increase the likelihood of appellant's conviction and punishment.[4]

For Appellant: *Lieutenant Colonel Michael D. Wims* (argued); *Lieutenant Colonel Patrick C. Sweeney.*

For Appellee: *Lieutenant Colonel Robert E. Giovagnoni* (argued); *Colonel Kenneth R. Rengert* and *Major Robert E. Ferencik, Jr.* (on brief).

## Opinion of the Court

COX, Judge:

This appeal involves the interrelationship between the Confrontation Clause of the Sixth Amendment to the Constitution of the United States and the evidentiary rules regarding the admissibility of hearsay statements. Here we hold that certain out-of-court statements were properly admitted in evidence, but others were not. The facts and the case history of the instant appeal may be succinctly stated.

### I

Appellant had two stepdaughters, "A" and "B," ages 14 and 18 respectively.[1] A general court-martial with members convicted appellant of numerous sex offenses against the 18–year-old and one sex offense against the 14–year-old.[2] The offenses came to light after Mrs. Hines, the natural mother of the girls, walked in on appellant as he was apparently in the process of

---

1. He also had a stepson, but there has been nothing to suggest that he was in any way victimized by appellant.

2. With respect to the 18–year-old, appellant was convicted of two specifications of sodomy and three specifications of indecent, lewd, and lascivious conduct, in violation of Articles 125 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 925 and 934, respectively. With respect to the 14–year-old, appellant was convicted of one specification of indecent, lewd, and lascivious conduct, in violation of Article 134.

3. The elder daugther, "B," was evidently less involved in this reconciliation process. About a month after the offenses came to light, she left home (Lowry AFB, Colorado) and moved to

New Hampshire. The attitude she expressed toward appellant was considerably less enthusiastic than that of her sister and mother. *See* n.4, *infra.*

4. "B" complied with the terms of her subpoena, apparently willingly, and appeared before the court-martial. However, at an out-of-court hearing, upon trial counsel's examination, she declined to testify, giving as her reasons:

A   I went to the defendant's house. I went to observe and to get more reasons on why I should or should not testify, and I found enough reason not to testify in the best interests of my sister and brother.

Upon questioning by the military judge, she amplified her thought process as follows:

A lengthy evidentiary hearing was conducted on the manner in which the statements were taken and the character of the witnesses. Defense counsel argued that receipt of the evidence violated the Sixth Amendment and the rules of evidence. Both sides stressed the factors they contended were probative on the issue of reliability. The military judge ruled:

> The 804(b)(5)[*see infra*] issue to my mind is controlled by the case of *United States versus Ruffin* [12 M.J. 952 (A.F.C. M.R.), *pet. denied*, 13 M.J. 494 (C.M.A. 1982)]. It is my determination that the statements, each of them, that is Prosecution Exhibits 5, 6, and 7, do qualify within that particular rule.

After findings, the defense presented evidence of the family's intense desire to remain united and their cooperativeness and participation in a variety of counseling and other rehabilitative programs. In addition, the defense called Mrs. Hines and "A" as witnesses.[5] Both readily took the stand, declared their love and affection for appellant, and pleaded with the court-martial not to sentence appellant to confinement. Nonetheless, appellant was sentenced to a bad-conduct discharge, confinement for 3 years (reduced to 2 years by the convening authority), and reduction to airman basic. The Court of Military Review affirmed, with two judges concurring in the result. 18 M.J. 729 (A.F.C.M.R. 1984). We granted review of the following issue:

> WHETHER THE MILITARY JUDGE ERRED BY ADMITTING PURSUANT TO THE RESIDUAL HEARSAY EXCEPTION, PRIOR WRITTEN STATEMENTS OF THE THREE KEY WITNESSES AFTER THEY REFUSED TO TESTIFY EITHER AT THE ARTICLE 32 INVESTIGATION AND AT THE TRIAL, THEREBY AFFORDING THE DEFENSE NO OPPORTUNITY TO CONFRONT AND CROSS–EXAMINE THE WITNESSES.

## II

The Sixth Amendment to the United States Constitution provides, in part: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." This prohibition parallels to some extent the evidentiary "rule against hearsay," *McCormick on Evidence* § 244, *et seq.* (E.Cleary 3d ed. 1984), wherein hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). The Supreme Court has agreed that these two concepts "are generally designed to protect similar values," *California v. Green*, 399 U.S. 149, 155, 90 S.Ct. 1930, 1933, 26 L.Ed.2d 489 (1970), and "stem from the same roots." *Dutton v.*

Q How do you see that as in their best interests?
A I mainly went to the house to observe—to see how they've been treated and how they feel about the environment at home at the present time, and I see that they are in no danger concerning the defendant, Roland Hines. And I believe that my testimony may give him a more severe sentence than if I didn't testify, and then that would not be in the best interests of my sister and brother, as therefore he may not be around for them, which I feel he should be.
Q He's living with your sister and brother now?
A As far as I know, yes.

The military judge further discussed at length "B's" obligation to testify under the law and explained the consequences of a failure to obey an order to testify. Nonetheless, "B" refused to testify. At no time, however, did she recant any part of her prior statement.

Mrs. Hines was even less cooperative, having refused to honor her initial subpoena. However, upon threat of execution of a warrant of attachment, she appeared at the court-martial for the purpose of expressing her refusal to testify. The gist of her reasoning is set out in the appendix to this opinion. After further discussion of the obligation to testify and the consequences of failing to obey an order to testify, Mrs. Hines persisted in her refusal to testify.

The younger daughter, "A," similarly refused to testify, explaining, *inter alia:* "I love my dad and I want him to stay in the house." Neither she nor Mrs. Hines recanted any part of their previous statements.

5. By this juncture of the trial, "B" had apparently returned to New Hampshire.

*Evans,* 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970) (plurality opinion).

Hearsay rules, however, are typically "riddled with exceptions," *Ohio v. Roberts,* 448 U.S. 56, 62, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980), with the result that frequently out-of-court statements are admissible under the rules of evidence, despite the absence of an accused's opportunity to confront the declarant. Moreover, as any first-year law student knows, many out-of-court statements are not considered to be hearsay in the first place and, thus, are not forbidden by rules prohibiting hearsay. *See McCormick, supra,* § 249. Therefore, the "overlap" between the rule against hearsay and the Confrontation Clause is far from "complete," *i.e.,* the Confrontation Clause is more than a mere "codification of the rules of hearsay and their exceptions as they existed historically at common law." *California v. Green, supra* 399 U.S. at 155, 90 S.Ct. at 1933; *see Dutton v. Evans, supra* 400 U.S. at 86–87 n.17, 91 S.Ct. at 218–19 n.17. Indeed the Court has observed, "The historical evidence leaves little doubt ... that the Clause was intended to exclude some hearsay." *Ohio v. Roberts, supra* 448 U.S. at 63, 100 S.Ct. at 2537. It is necessary, therefore, to evaluate the out-of-court statements separately under the standards of the Confrontation Clause and the rules of evidence.

### A

Traditionally, it was recognized that "the core of the values furthered by the Confrontation Clause" was the "right to 'confront' the witness at the time of trial." *California v. Green, supra* 399 U.S. at 157, 90 S.Ct. at 1934. There, the Court explained:

> [T]he particular vice that gave impetus to the confrontation claim was the practice of trying defendants on "evidence"

which consisted solely of *ex parte* affidavits or depositions secured by the examining magistrates, thus denying the defendant the opportunity to challenge his accuser in a face-to-face encounter in front of the trier of fact.

*Id.* at 156, 90 S.Ct. at 1934. Hence, it is said "that the Confrontation Clause reflects a preference for face-to-face confrontation at trial," *Ohio v. Roberts,* 448 U.S. at 63, 100 S.Ct. at 2537 (footnote omitted), and "the purposes of confrontation" include: (1) insur[ing] that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forc[ing] the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth"; ... [and] (3) permit[ting] the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

*California v. Green,* 399 U.S. at 158, 90 S.Ct. at 1935, quoting 5 J. Wigmore, *Evidence* § 1367 (3d ed. 1940). Indeed, it is said that "[t]hese means of testing accuracy are so important that the absence of proper confrontation at trial 'calls into question the ultimate "integrity of the fact-finding process." ' " *Ohio v. Roberts, supra* 448 U.S. at 64, 100 S.Ct. at 2538, quoting *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1973), quoting *Berger v. California,* 393 U.S. 314, 315, 89 S.Ct. 540, 541, 21 L.Ed.2d 508 (1969).

Read literally, the Confrontation Clause would eliminate any and all exceptions to the hearsay rule, at least where the declarant did not actually testify. However, the Supreme Court has never taken such an extreme position. *Ohio v. Roberts, supra,* 448 U.S. at 63, 100 S.Ct. at 2537[6]; *Dutton v.*

---

**6.** In *Ohio v. Roberts,* 448 U.S. at 65, 100 S.Ct. at 2538, the Court made the statement that "[i]n the usual case ... the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." In *United States v. Inadi,* —— U.S. ——, 106 S.Ct. 1121, 1125, 89 L.Ed.2d 390 (1986), the Court clarified that the language in *Roberts* had to be read in the context of the issue then under examination, namely "the con-

*Evans,* 400 U.S. at 80, 91 S.Ct. at 215; *Mattox v. United States,* 156 U.S. 237, 243, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895); *see also United States v. Inadi,* —— U.S. ——, 106 S.Ct. 1121, 1124, 89 L.Ed.2d 390 (1986). In *Ohio v. Roberts, supra* 448 U.S. at 64, 100 S.Ct. at 2538, it was stated:

> The Court ... has recognized that competing interests, if "closely examined," *Chambers v. Mississippi,* 410 U.S. at 295 [93 S.Ct. at 1046], may warrant dispensing with confrontation at trial. See *Mattox v. United States,* 156 U.S. at 243 [15 S.Ct. at 339] ("general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case"). Significantly, every jurisdiction has a strong interest in effective law enforcement, and in the development and precise formulation of the rules of evidence applicable in criminal proceedings. See *Snyder v. Massachusetts,* 291 U.S. 97, 107 [54 S.Ct. 330, 332, 78 L.Ed. 674] (1934); *California v. Green,* 399 U.S., at 171–172 [90 S.Ct. at 1941–1942] (concurring opinion).

While the Supreme Court has yet "to map out a theory of the Confrontation Clause that would determine the validity of all such hearsay 'exceptions' permitting the introduction of an absent declarant's statements," *California v. Green, supra* 399 U.S. at 162, 90 S.Ct. at 1937, quoted in *Ohio v. Roberts, supra* 448 U.S. at 64–65, 100 S.Ct. at 2538, certain principles are known. First, as noted, there is the "preference for face-to-face confrontation." *Ohio v. Roberts, supra* at 63, 100 S.Ct. at 2537. However, when that is not possible because the witness has been shown to be unavailable, the Confrontation Clause, "[r]eflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, ... countenances only hearsay marked with such trustworthiness that 'there is no material departure from the reason of the general rule.'" *Ohio v. Roberts,* 448 U.S. at 65, 100 S.Ct. at 2539, quoting *Snyder v. Massachusetts, supra* 291 U.S. at 107, 54 S.Ct. at 333. In *Mancusi v. Stubbs,* 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293 (1972), the Court stated:

> The focus of the Court's concern has been to insure that there "are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant," *Dutton v. Evans, supra,* [400 U.S.] at 89 [91 S.Ct. at 220], and to "afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement," *California v. Green, supra,* [399 U.S.] at 161 [90 S.Ct. at 1936]. It is clear from these statements, and from numerous prior decisions of this Court, that even though the witness be unavailable his prior testimony must bear some of these "indicia of reliability" referred to in *Dutton.*

See also *Ohio v. Roberts, supra* 448 U.S. at 65–66, 100 S.Ct. at 2539.

Indeed, the Court has gone so far as to indicate that, "where the evidence falls within a firmly rooted hearsay exception," an inference of "[r]eliability ... [may be drawn] without more," and "that certain hearsay exceptions rest upon such solid foundations that admission of virtually any evidence within them comports with the 'substance of the constitutional protection.'" *Id.* at 66, 100 S.Ct. at 2539. Even when the evidence does not fall within such an exception, it may yet be admitted upon "a showing of particularized guarantees of trustworthiness." *Id.* at 66, 100 S.Ct. at

stitutional propriety of the introduction in evidence of the preliminary hearing testimony of a witness not produced at the defendant's subsequent state criminal trial." 448 U.S. at 58, 100 S.Ct. at 2535. The Court explained that *"Roberts* ... does not stand for ... a wholesale revision of the law of evidence." We take this as an indication that the Court has not required production or proof of unavailability of declarants of those types of hearsay statements that have classically been admitted without regard to the declarants' availability, *e.g.,* excited utterances, business records, learned treatises, etc. *See* Mil. R.Evid. 803(1)-(23).

2539 (footnote omitted). On the other hand, it must be noted that even "traditional 'exceptions' to the hearsay rule ... have been subjected on several occasions to careful scrutiny by" the Court. *California v. Green*, 399 U.S. at 161–62, 90 S.Ct. at 1936–37. Thus, where the witness is unavailable at trial, the reliability of the prior statement is the key. The question, then, is under what circumstances are the indicia of reliability so strong that a statement can be placed before a jury without the accused's having confronted the declarant?

## B

Despite its occasional use of sweeping language, the Supreme Court itself has been quite cautious in applying reliability analysis to specific facts. Many of the cases have dealt with prior recorded testimony. In these cases, where the accused were not denied representation by counsel at the prior hearings, where the witnesses were cross-examined, and where they were shown to be unavailable at the subsequent hearings, the Court has been satisfied with the indicia of reliability of prior testimony and has permitted its admission. Where any of these factors have been absent, at least in the context of prior recorded testimony, the result has been the reverse. *See Ohio v. Roberts, Mancusi v. Stubbs*, and *California v. Green*, all *supra; Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *West v. Louisiana*, 194 U.S. 258, 24 S.Ct. 650, 48 L.Ed. 965 (1904); *Motes v. United States*, 178 U.S. 458, 20 S.Ct. 993, 44 L.Ed. 1150 (1900); *Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409; *Reynolds v. United States*, 98 U.S. (8 Otto) 145, 25 L.Ed. 244 (1879).

At the other end of the spectrum, extrajudicial statements inculpating the accused, made by an alleged co-actor of the accused during an interrogation or other circumstances indicating an attempt to shift or spread the blame, have generally flunked the indicia-of-reliability standard and have been rejected. *See Lee v. Illinois*, —— U.S. ——, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986); *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *see also United States v. Cordero*, 22 M.J. 216 (C.M.A. 1986). A narrow exception to the foregoing, permitting the introduction of such statements, may occur if a co-actor's statement is so nearly identical to the accused's own pretrial admission that the two statements may be said to "interlock." *See Lee v. Illinois, supra; Parker v. Randolph*, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979); Note, *The Present Status of an Interlocking Confession Exception to Bruton v. United States*, 36 S.C. L.Rev. 659 (Summer 1985).

Between these two poles, at least in reliability analysis, the Supreme Court has seldom had occasion to comment. Even in *United States v. Inadi*, 106 S.Ct. 1121, wherein the statements of a non-testifying, unindicted co-conspirator made "during the course of and in furtherance of the conspiracy" were admitted into evidence, the Court expressly did not reach the reliability of the statements, but limited its review to "the question whether the Confrontation Clause requires a showing of unavailability as a condition to admission of the out-of-court statements," *id.* at 1124 and n.3 (which the Court answered in the negative).[7]

7. In addition, the Supreme Court has, in the past, relied on other theories besides reliability to justify admission into evidence of certain out-of-court statements. Thus in *Mattox v. United States*, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892), cited approvingly in *Pointer v. Texas*, 380 U.S. 400, 407, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923 (1965), "necessity" and "the certain expectation ... [that] almost immediate death will remove all temptation to falsehood and enforce as strict adherence to the truth as the obligation of an oath could impose" (146 U.S. at 152, 13 S.Ct. at 54) justified admission of dying declarations "made under a sense of impending death." *Id.* at 151, 13 S.Ct. at 54. In *Mattox v. United States*, 156 U.S. 237, 243, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895), cited approvingly in *Ohio v. Roberts, supra* 448 U.S. at 64, 100 S.Ct. at 2538, "considerations of public policy and the necessities of the case" justified admission of a transcribed copy of a court reporter's stenographic

The lower Federal courts have had more occasions to assess the reliability of various types of out-of-court statements. In several cases, depositions have been found to be sufficiently reliable. *Ewing v. Winans*, 749 F.2d 607 (10th Cir. 1984); *United States v. Terrazas-Montano*, 747 F.2d 467 (8th Cir. 1984); *United States v. Knop*, 701 F.2d 670 (7th Cir. 1983). In *Haggins v. Warden*, 715 F.2d 1050 (6th Cir. 1983), *cert. denied*, 464 U.S. 1071, 104 S.Ct. 980, 79 L.Ed.2d 217 (1984), excited utterances were found to be sufficiently reliable. Grand jury testimony has been admitted. *United States v. Barlow*, 693 F.2d 954 (6th Cir. 1982), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983); *United States v. Garner*, 574 F.2d 1141 (4th Cir.), *cert. denied*, 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978); *United States v. West*, 574 F.2d 1131 (4th Cir. 1978); *United States v. Carlson*, 547 F.2d 1346 (8th Cir. 1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977); *contra United States v. Gonzalez*, 559 F.2d 1271 (5th Cir. 1977). In *Rice v. Marshall*, 709 F.2d 1100, 1104 (6th Cir. 1983), *cert. denied*, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984), a sworn written statement to law-enforcement officers was sufficiently reliable (where the witness was later "intimidated into silence by appellant 'or his functionaries' ").

Moreover, in certain circumstances, an accused's right to confrontation can be waived by his misconduct. *E.g., Taylor v. United States*, 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973) (accused's voluntary disappearance); *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970)(accused's disruption of the proceedings); *United States v. Balano*, 618 F.2d 624 (10th Cir. 1979), *cert. denied*, 449 U.S. 840, 101 S.Ct. 118, 66 L.Ed.2d 47 (1980) (accused's threats on witness' life); *Steele v.*

*Taylor*, 684 F.2d 1193, 1201 and n.10 (6th Cir. 1982), *cert. denied*, 460 U.S. 1053, 103 S.Ct. 1501, 75 L.Ed.2d 932 (1983) ("persuasion and control" of witness); *see also Rice v. Marshall, supra.*

■ To summarize, in order for out-of-court statements to be admissible under the Confrontation Clause, it is preferable for face-to-face confrontation to occur at trial. Failing that, it is essential that the statements bear "indicia of reliability" such that "there is no material departure from the reason of the general rule."

C

■ With respect to whether appellant waived his right to confront the witnesses, *i.e.,* whether he was responsible for their failure to testify, we conclude that the indications of record come close, but ultimately fail, to establish such a waiver (the issue was apparently not identified at trial). What are these indications? For one, appellant testified, in connection with a defense motion to suppress his pretrial admissions as being involuntarily induced, that within a week of his wife's discovery, she began calling him at the barracks where he was temporarily quartered. Within a few more days, his depression ceased, "because my wife and I had made a commitment to get back together and also we had become Christians." Further, as previously mentioned, there was the witnesses' refusal to testify against appellant and their willingness to testify for him. Appellant himself testified, on sentencing, about his extensive efforts to keep his family together.

In addition, during a defense challenge to the jurisdiction of the court-martial,[8] a witness from the Family Crisis Center of the

---

notes of two witnesses' testimony at a previous trial against the accused (the witnesses having died before the subsequent trial).

8. *I.e.,* even though all of the alleged offenses were committed on Lowry AFB, the defense argued, unsuccessfully, that the interests of the civilian authorities were paramount to those of the military authorities and that, therefore, the military had no jurisdiction to prosecute appellant. *See Schlesinger v. Councilman*, 420 U.S. 738, 760, 95 S.Ct. 1300, 1314, 43 L.Ed.2d 591 (1975); *Relford v. Commandant*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971); *O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969).

Denver Department of Social Services [9] described the family's cooperativeness in the "therapeutic steps" that had been undertaken and the "very good bonding" that had taken place "between all the members of the family." The witness also felt that the family sessions and marriage counseling had been a success.

During sentencing, appellant's privately employed family counselor also testified that appellant and his family had made enormous progress in their communication, that appellant had been permitted to move back in with his family before his trial commenced, and that the reunification seemed to be successful. Further, an Air Force social worker who was monitoring the family's progress testified during presentencing that the family had been "very cooperative" in their "intensive" treatment program. Appellant's civilian pastor described the family's extraordinary transformation and observed that, "[f]rom the first time that I met Sergeant Hines and his wife [which was apparently shortly after the offenses came to light], I could see a sincere desire to be a family." The City of Denver social worker was recalled and again described the sustained cooperation of the family in the extensive rehabilitation program and their successful reunification.

Admittedly, one can scarcely read this record without applauding the efforts of this family to work out its problems. However, our concern for the moment is the extent of influence appellant exerted over his family. The evidence, in retrospect,[10] shows that, by the time of trial, the family was functioning as a unit to resist appellant's conviction and sentence. Indeed, it is quite clear that it was the Government, if anybody, that was unable to confront the witnesses by the time of trial. On the other hand, there is considerable evidence that, at the time of trial, the witnesses all had reasons of their own for not wanting to

see appellant punished. Thus, had the foregoing information been available to the military judge, the interesting question of whether such a total family effort waived or excused the absence of confrontation would have been squarely presented. *Cf. United States v. Rousseau*, 21 M.J. 960, 962 (A.C.M.R.) *pet. granted*, 23 M.J. 176 (1986).

In a sense, it is ironic that appellant should claim that his confrontation rights were violated, for it is obvious that the very last thing he wanted to do was to confront the witnesses. By their not testifying, he could, and did, move to suppress their pretrial statements on constitutional grounds. In this manner, he sought to eliminate most of the damaging evidence against him (save for his own confessions, which would have then been largely uncorroborated). On the other hand, had the family members taken the stand, even if to recant their previous statements, his confrontation argument would have vanished. *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489. It is also somewhat incongruous that he should rest his claim on the Confrontation Clause in a case in which he himself produced the witnesses when it was in his interest. Since the Confrontation Clause was intended to permit an accused to face, cross-examine, and otherwise test adverse witnesses, this case certainly does not fit into the usual mold. What, in effect, appellant was trying to do was to use the clause to prevent, rather than to secure, confrontation. In other words, he was using it as a sword, not as a shield.

Professor Westen, in his pioneering work, *Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases*, 91 Harv.L.Rev. 567 (1978), has analyzed the interrelationship

---

**9.** Apparently, by prearrangement among Lowry AFB authorities, the Denver family courts, and the Denver Department of Social Services, cases of this nature were routinely referred to the Department of Social Services for the purpose of providing more extensive social welfare services than local military resources could provide.

**10.** Of course we realize that much of this evidence was not available to the military judge at the time he had to make decisions.

between these two clauses [11] and their respective functions. We strongly suspect the answer to our dilemma lies somewhere in the interstice of the clauses. Unfortunately, Professor Westen does not discuss a scenario like the one before us, and we have found no other authorities on point. Due to this dearth of authority and because it is at least theoretically possible that witnesses in such a case might refuse to testify even if the accused actually wanted them to, we decline to hold that the concerted actions of appellant's family were sufficient to waive his right to confront them—at least absent a specific factual finding that they were being controlled by appellant.

D

We are not through, however, with the ironies of this case. The next question is whether the witnesses were "available" under conventional constitutional standards. The Government's obligation was to exert all reasonable measures to acquire the presence of the witnesses and tender them for cross-examination. *Mancusi v. Stubbs*, 408 U.S. at 212, 92 S.Ct. at 2312; *Barber v. Page*, 390 U.S. at 724–25, 88 S.Ct. at 1321–22; *Motes v. United States*, 178 U.S. at 474, 20 S.Ct. at 999. Of course, the Government actually produced the witnesses, and no restrictions were imposed on appellant's ability to cross-examine or his accessibility to them. *Cf. Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968).

It is true that the military judge did not, as he might have, institute formal legal proceedings against the witnesses in order to force them to testify.[12] In other circumstances, we have been quite insistent that the Government exhaust every means to secure the preferred live testimony before utilizing an out-of-court declaration. *United States v. Cokeley*, 22 M.J. 225 (C.M.A. 1986). At the same time, it is unnecessary for the Government to undertake "a futile act." *Ohio v. Roberts*, 448 U.S. at 74, 100 S.Ct. at 2543. Here, the witnesses made it quite plain that they would go to jail rather than testify. Given their apparent determination and their close relationship with appellant, we think the judge was justified here in taking the witnesses at their word.[13]

The irony is that it was this very refusal to testify that rendered the witnesses constitutionally "unavailable." *California v. Green*, 399 U.S. at 167, 90 S.Ct. at 1939; *cf.* Mil.R.Evid. 804(a)(2), Manual for Courts-Martial, United States, 1969 (Revised edition). Thus, under the Sixth Amendment, there remains only the matter of whether the statements bore sufficient "indicia of reliability" to permit their introduction in the absence of cross-examination. However, we defer this question until we take up the correlative standard under the hearsay exceptions.

III

Mil.R.Evid. 804(b)(5) provides:

11. The Compulsory Process Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor."

12. Article 47(a)(3), UCMJ, 10 U.S.C. § 847(a)(3), makes it an offense against the United States for any person, having been duly subpoenaed as a witness before a court-martial, to refuse to testify. Article 47(c), UCMJ, 10 U.S.C. § 847(c) provides that, upon proper certification of the facts by the court-martial, the United States Attorney shall prosecute such violators. *See United States v. Hinton*, 21 M.J. 267 (C.M.A. 1986).

13. For some offenses, it may not be at all unthinkable for the Government to seek to incarcerate victims or close family members of the accused for failing their societal obligation to present evidence when properly called upon by a court of law. However, in this case, we assume that the Government would never actually have pursued confinement of the witnesses. Rather, it would have been forced to abandon the prosecution—a probability no doubt taken into consideration by the witnesses. Note that, because the charges involved crimes against Mrs. Hines' children, neither she nor appellant had a right to assert a spousal privilege against testifying. Mil.R.Evid. 504(c)(2)(A).

(b) *Hearsay exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \*

(5) *Other exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the military judge determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative of the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interest of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the intention to offer the statement and the particulars of it, including the name and address of the declarant.

*See also* Mil.R.Evid. 803(24).

The materiality of the statements is not in dispute. Further, they were more probative than any other evidence because the prosecution had no other evidence of the witnesses' claims. Also, in all but one instance (the alleged discovery in the act), the statements constituted the sole evidence corroborating appellant's confessions. Mil.R.Evid. 304(g). As to some of the specifications, moreover, the statements constituted the only evidence in the case. Regarding "the interest of justice" requirement, we can do no better than parrot 4 D.Louisell and C.Mueller, *Federal Evidence* 939 (1980), which states:

> This requirement echoes the directive in Rule 102 to construe the Rules so as to "secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined."

These high aims are important. They are unlikely, however, to provide much guidance in the resolution of specific problems, and clause (C) has not proved significant in decisions construing the instant exception.

(Footnote omitted.) As the record leaves no doubt that appellant was on notice of the prosecution's intention to use the statements, we again arrive at the issue of reliability. However, even here, there are a few preliminary matters to be resolved.

IV

■ Initially, we note that the constitutional requirement that the evidence be taken under circumstances bearing "indicia of reliability" appears on its face to be closely related to the evidentiary requirement that the evidence have "equivalent circumstantial guarantees of trustworthiness." Since, to be admissible, residual hearsay statements have to pass both constitutional and evidentiary muster, we can see no harm in "constitutionalizing" this aspect of Mil.R. Evid. 804(b)(5). Therefore, we agree with those courts that have construed these requirements to be equivalent. *See, e.g., United States v. Nick,* 604 F.2d 1199, 1203 (9th Cir. 1979); *United States v. West,* 574 F.2d at 1138.

■ Next, we reject any notion that the new residual hearsay exceptions may be considered so "firmly rooted" that evidence falling within them is inferentially reliable. *United States v. Barlow,* 693 F.2d at 964; *cf. Ohio v. Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539. Therefore, in order for the statements to be admissible, "particularized guarantees of trustworthiness" must have been shown. *Ohio v. Roberts, supra.*

In that regard, the United States Court of Appeals for the Ninth Circuit has well stated:

> The values inhering in the confrontation clause cannot be effectively preserved by any mechanical application of the hearsay rule. The question in each case must be whether a particular hearsay declara-

tion, otherwise inadmissible, has such great probative value as evidence of a material fact and such a high degree of trustworthiness under all of the circumstances that its reception outweighs any risk to a defendant that unreliable evidence may be received against him, the deficiencies of which he cannot adequately test because he cannot cross-examine the declarant.

*United States v. Nick, supra* at 1203. *See also United States v. Young,* 736 F.2d 565, 569 (10th Cir. 1983), *rev'd on other grounds,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (Sixth Amendment objections warrant "a case-by-case analysis of the circumstances" in which such statements are offered).

As noted, the military judge's ruling is couched in terms of the statements being admissible under case precedent, rather than a case-by-case approach. Further, the judge did not advert to the confrontation claim. In the context in which the ruling was made, however, we are satisfied that he actually undertook a case-by-case analysis, and his rejection of the constitutional argument was implicit. We reach these conclusions because the ruling followed a lengthy and detailed evidentiary hearing into the circumstances of the taking of the statements and the character of the witnesses. Also, the ruling followed extensive argument by respective counsel as to why the circumstances indicated reliability versus unreliability. Finally, many of the factors set out as indicating reliability in the case cited by the judge, *United States v. Ruffin,* 12 M.J. 952, were also present in the instant case.

■ As to the matter of form, however, the judge was remiss. He should have "stated on the record" "the special facts and circumstances which" he thought "indicate[d] that the statement[s] ha[d] a sufficiently high degree of trustworthiness and necessity to justify ... [their] admission." S.Rep.No. 1277, 93d Cong., 2d Sess., *reprinted in* U.S. Code Cong. & Admin. News 7051, 7066 (1974) (pertaining to the Federal residual hearsay exceptions, which were incorporated without change into Mil. R.Evid. 803(24) and 804(b)(5)). *See also Huff v. White Motor Corp.,* 609 F.2d 286, 291–92 (7th Cir. 1979); *United States v. Palacios,* 556 F.2d 1359, 1363 n.7 (5th Cir. 1977); S.Saltzburg, L.Schinasi, and D.Schlueter, *Military Rules of Evidence Manual* 654, 683 (2d ed. 1986). The absence of such explanation invites speculation on review and may prompt a Court of Military Review, in its plenary review authority, Art. 66(c), Uniform Code of Military Justice, 10 U.S.C. § 866(c), "to attempt to replicate the exercise of discretion that would be made by a trial judge in making the ruling." *Huff v. White Motor Corp., supra* at 292. The result may be that factors which impressed a trial judge as being quite weighty may not be so apparent to a reviewing court. Since the military judge is in the best position to make many close calls, particularly with regard to witness credibility, his reasons should be disclosed.

To compound matters in the instant case, appellant's conviction was affirmed by a divided Court of Military Review. 18 M.J. 729. Judge Miller, writing the lead opinion, equated, as do we, "the ... 'indicia of reliability' standard" of the Confrontation Clause with "the 'equivalent circumstantial guarantees of trustworthiness'" standard of Mil.R.Evid. 804(b)(5). *Id.* at 735. Further, replicating the military judge's exercise of discretion, he identified eleven factors which convinced him that the statements were of "a sufficiently high degree of trustworthiness to demonstrate that the judge did not abuse his discretion by admitting" them. *Id.* at 742. These included that:

(1) the ... declarants signed their respective statements under oath.[*]

(2) ... the detailed circumstances of how those interviews were conducted tended to affirm their accuracy and trustworthiness, rather than detract from these qualities.[*]

(3) the ... declarants ... were members of the accused's household, financially dependent upon him .... The societal

stigma that automatically attached to all three of the declarants ... must be considered as nothing less than personally devastating.[*]

(4) none of the three declarants ... recanted the subject declarations. [*]

(5) the reasons stated by each of the declarants at trial for refusing to testify ... tended to reaffirm the veracity of their respective out-of-court declarations.[*]

(6) the reputation for truthfulness of each of the declarants was successfully established by independent testimony.[*]

(7) no cogent motivation was suggested ... for either ... [appellant's] wife or his youngest stepdaughter to lie. The only motivation suggested ... for his eldest stepdaughter to lie ... was also entirely consistent with the truthfulness of the allegations contained in her out-of-court declaration.[*]

(8) all three declarants clearly had first hand knowledge of the events to which their out-of-court declarations pertained.[*]

(9) the fact that "things weren't right" within the accused's family during the time periods ... [in question] was corroborated by the testimony of a neighbor and family friend.[*]

(10) each of the three out-of-court declarations tended to corroborate the truthfulness of the others.[*]

(11) perhaps most importantly of all, the accused voluntarily confessed to having committed all the acts alleged against him by each of the out-of-court declarants in their respective declarations. [*]

*Id.* at 742–43 ( [*] = citations omitted).

The remaining two judges of that court concurred only in the result, holding, as did the military judge, that admissibility was governed by *United States v. Ruffin*, 12 M.J. 952.[14]

A

Based on our review of the record, we agree with Judge Miller that the statements bore "indicia of reliability" and "circumstantial guarantees of trustworthiness." Certainly the factors cited by Judge Miller are similar to those cited by many courts as being indicative of reliability and trustworthiness with respect to out-of-court statements. *E.g., United States v. Barlow*, 693 F.2d 954; *United States v. Van Lufkins*, 676 F.2d 1189 (8th Cir. 1982); *United States v. Barnes*, 586 F.2d 1052 (5th Cir. 1978); *United States v. West*, 574 F.2d 1131; *United States v. Williams*, 573 F.2d 284 (5th Cir. 1978); *United States v. Leslie*, 542 F.2d 285 (5th Cir. 1976). Moreover, even though reports by police officers of matters observed by them in their official capacity do not fall into the *"Public records and reports"* exception to the hearsay rule, Mil.R.Evid. 803(8)(B), *see United States v. Cordero*, 22 M.J. at 223, there are far too many cases holding statements to law-enforcement officers to be reliable, in the circumstances, to contend that statements to such officials are *per se* unreliable. *E.g., Rice v. Marshall*, 709 F.2d 1100; *Steele v. Taylor*, 684 F.2d 1193; *United States v. Van Lufkins, United States v. Barnes,* and *United States v. Williams,* all *supra; United States v. Ward*, 552 F.2d 1080 (5th Cir. 1977).

All of these preceding cases involve admission into evidence of out-of-court statements. However, all but one differ from the instant case in at least one significant respect. In *West*, the witness was mur-

14. We are somewhat troubled by the following conclusion in the separate opinion:

The President has the authority to create a new exception to the hearsay rules without violating constitutional rights, where there is a necessity for it and where it is supported by an adequate basis for concluding that the evidence has those qualities of reliability and trustworthiness attributed to the other exceptions to the hearsay rule.

18 M.J. 729, 744, *citing* Art. 36, UCMJ, 10 U.S.C. § 836, and *United States v. Ruffin*, 12 M.J. 952 (A.F.C.M.R.), *pet. denied*, 13 M.J. 494 (1982). It is just such an ability to spawn new hearsay exceptions that necessitates the independent constitutional analysis. *See California v. Green*, 399 U.S. 149, 154–56, 90 S.Ct. 1930, 1932–34, 26 L.Ed.2d 489 (1970).

dered, and his preliminary hearing testimony was used. In *Barlow,* the witness asserted a privilege not to testify, and the statements introduced were grand jury testimony. In *Rice,* the accused's intimidation of the witness waived his right to confrontation. Similarly, in *Steele,* the witness' refusal to testify was procured by the defendants. In *Barnes,* the witness testified at trial and was subject to cross-examination about her prior inconsistent confession. In *Williams,* the witness testified and was cross-examined concerning his prior affidavit. Thus, the admission of these statements can be justified either on the basis of necessity or waiver, or else some form of confrontation was available. Even grand jury proceedings, though *ex parte* in the sense that the accused is usually not present or represented, at least take on the appearance and dignity of an official hearing and permit the possibility of a more open, neutral and pluralistic interrogation than does a private interview conducted by a police officer. Only in *Ward* was the declarant not present at trial and his absence not caused by the accused. The reliability of that statement was established primarily through extensive corroboration.

Our difficulty with the instant case hasn't so much to do with the general reliability of statements to police officers or the manner in which they were taken. As a practical matter, we are quite prepared to assume that law-enforcement officers are, as a group, highly reliable and professional (with occasional, notable exceptions). If it were otherwise, how could courts ever admit confessions to police officers? Our concern, notwithstanding due respect for the law-enforcement community, is whether *ex parte* statements to law-enforcement officers are obtained with such a degree of bipartisanship that an accused cannot reasonably contend that the purposes of cross-examination have not been served?

The instant facts are, perhaps, instructive. Both girls, it happens, made statements to a military social worker after they were interviewed by Special Agent McNeal.[15] During these interviews, both girls allegedly said things that were plainly inconsistent with their statements to McNeal. The eldest girl, for instance, denied that appellant had ejaculated or inserted his finger into her vagina. Yet both of these assertions appear in her signed statement. The younger girl, on the other hand, denied to McNeal that appellant had performed cunnilingus on her (he was not charged with committing such an act on her); yet she told the social worker that he had.

With this in mind, our concerns are these: Since McNeal's questioning is proffered as a replacement for cross-examination, was it equivalent to cross-examination? In other words, was McNeal as zealous at uncovering the weaknesses in the prosecution's case (such as the above-mentioned inconsistencies) as defense counsel would have been? Was he intent on exploring all possibilities of reasonable doubt as to guilt, or was he, in effect, content with making out a *prima facie* case? On this record, we think that the investigative process was not equivalent to the judicial process, and we would not ordinarily expect it to be. Hence, we do not believe that McNeal's examination of the declarants by itself "comport[ed] with the 'substance of the constitutional protection.'" 448 U.S. at 66, 100 S.Ct. at 2539.

**B**

■■ However, appellant's confession to a majority of the conduct alleged changes the complexion of the case to a considerable degree.[16] Coupled with the regularity in the taking of the out-of-court statements and the other factors noted by Judge Miller, appellant's admissions so confirm the

15. Only one of these statements was used on the merits. *See* 23 M.J. at 126.

16. We do not overlook the significance of Mrs. Hines' excited utterances upon discovering appellant in the apparently lewd and lascivious act as corroborating that specification.

reliability of the declarant's statements, at least to the extent of actual corroboration, that our misgivings about "afford[ing] the trier of fact a satisfactory basis for evaluating the truth of the prior statement," *California v. Green,* 399 U.S. at 161, 90 S.Ct. at 1936, and about appellant's inability to confront his adversaries are *pro tanto* extinguished.[17] As a plurality of the Supreme Court has noted, albeit in the context of interlocking confessions, "the 'constitutional right of cross-examination' ... has far less practical value to a defendant who has confessed to the crime than to one who has consistently maintained his innocence." *Parker v. Randolph,* 442 U.S. at 73, 99 S.Ct. 2139. Thus, to the extent that appellant actually confessed to the allegations, we conclude the findings of guilty can stand. Our review of the record discloses, however, that appellant's admissions do not extent to the conduct alleged in specification 1 of Charge I (sodomy with "B" on or about June 1–30, 1981) or specification 2 of Charge II (masturbating in the presence of "B" between May 1–31, 1981).

The decision of the United States Air Force Court of Military Review as to specification 1 of Charge I and specification 2 of Charge II and the sentence is reversed. The findings of guilty thereon are set aside, and those specifications are dismissed; the record of trial is returned to the Judge Advocate General of the Air Force for submission to that court for reassessment of the sentence based on the remaining findings of guilty.

Chief Judge EVERETT concurs.

Judge SULLIVAN did not participate.

### APPENDIX

Questions [of Mrs. Hines] by the Asst Trial Counsel:

\* \* \* \* \* \*

Q Have you been subpoenaed to testify in this case?

A I did not accept the subpoena.

\* \* \* \* \* \*

Q Do you know the accused in this case?

A I said I would not testify.

\* \* \* \* \* \*

Questions by the Military Judge:

\* \* \* \* \* \*

Q Would you tell me why you refuse [to testify]?

A For the best interests of my family and my husband.

Q How do you see that in your best interests?

A The way of God.

Q The way of God?

A Yes.

Q I cannot understand that.

A Okay, we became Christians after everything—after my husband had been arrested and we committed our lives to God, and for the best interests of my children and myself and my husband. The family will be united.

Q Does not your religion permit you to recognize that courts are proper?

A No.

Q Courts are not proper?

A Yeah, they are proper.

Q Oh, they are proper. So you recognize that there is an authority there that is not prohibited by your religion?

A Well, if I go by my belief, or not by my belief in God, he judged my husband already.

\* \* \* \* \* \*

Q For example, if I should order you [to] speak and you should decline to

---

**17.** Corroboration alone, however, without other factors indicating reliability, would generally not suffice to render statements reliable. *Unit-ed States v. Bailey,* 581 F.2d 341, 349 (3d Cir. 1978).

speak, that falls into an area called contempt of court.

A  Uh huh.

Q  You are not concerned with any of those consequences?

A  No.

Q  You are not concerned with the legitimate interest of society in this case?

A  No.

\*    \*    \*    \*    \*    \*

Q  You said you did not wish to testify because, first, you believe that God has judged your husband?

A  Yes.

Q  And second, you felt that your refusal to testify would be in the best interest of your family.

A  Yes.

Q  So in other words, if your husband is convicted, and potentially sentenced from that conviction, you feel that that would have an adverse effect on your family?

A  Yes.

Q  In what way?

A  Like I said, we unite, we have a family, a happy family, and for my children and my husband, for all our sake. We are a happy family now.