UNITED STATES,

v.

Norbert A. QUARLES, 449 88 8014 Hospital Corpsman First Class (E–6), U.S. Navy.

NMCM 86 0575.

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 9 Oct. 1985.

Decided 30 Nov. 1987.

LTCOL RICHARD E. OUELLETTE, USMC, Appellate Defense Counsel.

LCDR LAWRENCE W. MUSCHAMP, JAGC, USN, Appellate Government Counsel.

Before COUGHLIN, Senior Judge, and MIELCZARSKI and DECARLO, JJ.

MIELCZARSKI, Judge:

Contrary to his pleas, appellant was convicted by a general court-martial (with members) of committing an indecent assault upon and sodomizing his five-year-old daughter, A, as well as committing numerous acts of sodomy upon his four-year-old daughter, D, and one act of sodomy on his six-year-old son, N.[1] He was sentenced to confinement for 12 years, total forfeitures, reduction to pay grade E–1, and a dishonorable discharge. The convening authority approved the findings with respect to the offenses upon A and N, and approved only so much of the finding of guilty with respect to the sodomy of D which provid-

---

1. Violations of Articles 125 and 134 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 925, 934.

ed that sodomy occurred on one occasion vice diverse occasions; he approved the sentence as adjudged.

Before this Court, the appellant raises twelve assignments of error. We find merit with assignments VI, VIII, and XI. Because we reverse appellant's conviction, we will not discuss the remaining assignments.[2]

## VI

THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT BY PERMITTING A PROSECUTION PSYCHOLOGIST, PURSUANT TO MILITARY RULE OF EVIDENCE 803(4), TO REPEAT STATEMENTS MADE BY THE ALLEGED VICTIMS OF SEXUAL ASSAULT.

## VIII

THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT BY ADMITTING THE TESTIMONY OF MRS. BEVERLY *HUGHES*, MRS. SUSAN E. *MAURICE*, MRS. FRANCIS M. *SCHMITZ*, MRS.

SHERRY ANN *GREEN*, SPECIAL AGENT MARTIN G. *NATHAN* AND MRS. EARLDEAN *FUTRELL*.

## XI

TRIAL COUNSEL'S CLOSING ARGUMENT, WHICH WAS IMPASSIONED AND DESIGNED TO AROUSE THE EMOTIONS OF THE COURT MEMBERS, OVERSTEPPED THE BOUNDS OF PROPRIETY AND VIOLATED APPELLANT'S RIGHTS.

## FACTS

Appellant is the divorced father of three young children, all of whom resided with him during the spring of 1985, the period in which the charged offenses were alleged to have occurred. Because of his status as a single parent, appellant employed babysitters to care for his children while he worked. The charges in question arose from statements made by the children to several of the babysitters.

Mrs. Beverly Hughes cared for the Quarles children from September through

2.

I
THE MILITARY JUDGE ERRED IN DENYING THE CHALLENGE FOR CAUSE AGAINST LIEUTENANT COLONEL H.B. FOORE, USMC.

II
THE APPELLANT WAS DENIED A COURT COMPOSED OF A FAIR CROSS-SECTION OF THE MILITARY COMMUNITY WHERE THE COURT CONVENED.

III
THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT IN ADMITTING INTO EVIDENCE PROSECUTION EXHIBITS 5 AND 6 TOGETHER WITH THE TESTIMONY OF MRS. SHELLEY DAUM CONCERNING PORNOGRAPHIC MATERIALS FOUND IN THE APPELLANT'S HOME.

IV
THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT BY REFUSING TO ALLOW THE DEFENSE COUNSEL TO INTERVIEW THE ALLEGED VICTIMS PRIOR TO TRIAL DESPITE THE FACT THAT THE TRIAL COUNSEL HAD UNLIMITED ACCESS.

V
THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPEL-

LANT BY REFUSING TO ALLOW DOCTOR SEYMORE KUVEN, A FORENSIC PSYCHIATRIST, TO INTERVIEW THE ALLEGED VICTIMS.

VII
THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT BY PERMITTING THE ALLEGED VICTIMS TO TESTIFY IN AN ADJOINING COURTROOM USING CLOSED-CIRCUIT TELEVISION.

IX
THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR BY ADMITTING THE TESTIMONY OF DR. THOMAS GRANT IRONS AND MRS. ELIZABETH RALSTON ON THE RELIABILITY OF REPORTS OF SEXUAL CHILD ABUSE AND SUBSEQUENT RETRACTIONS THEREOF AS EXPERT OPINION.

X
THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT BY AUTHORIZING THE TESTIMONY OF EXPERT WITNESSES ON THE CREDIBILITY OF CRUCIAL WITNESSES.

XII
THE CUMULATIVE EFFECT OF THE ERRORS DEPRIVED APPELLANT OF HIS RIGHT TO DUE PROCESS.

December 1984 during which time she claimed appellant's house to be dirty and smelling of urine. She was concerned for the welfare of the children and made at least one attempt to contact the base chaplain at Camp Lejeune to report the conditions. Her complaint sounded in neglect due to the substandard living conditions she observed and did not contain any allegation of sexual abuse despite the fact that she had earlier discovered A naked, engaged in a humping motion upon her five-year-old son. She was also concerned with seeing that appellant's children received Christmas gifts because appellant earlier told her that he would not be able to afford any presents. She asked her parents to donate gifts and she solicited other assistance through a local newspaper. Mrs. Hughes stopped caring for the children after Christmas because the appellant could not pay in advance for her services. She notified the North Carolina State Department of Social Services (DSS) about the conditions at the Quarles household some three months later, on 18 April 1985, the same day that she learned that appellant had purchased a new automobile.[3]

Mrs. Sherry Ann Green assumed the babysitting job after Mrs. Hughes. In February of 1985, while the children were at her home, she noticed N with his hand down D's pants. She scolded N and told him that she would tell the appellant when he returned home. N replied, "My dad allows me." A then stated, "Yes Mrs. Green, daddy allows [N] to play with us and do that to us." A went on to say that appellant had placed his penis into her mouth. Later that evening at dinner, Mrs. Green observed A and D moving hot dogs in and out of their mouths, stating, "Ooo! Look at the white stuff!" She later confronted Quarles about N's actions. She did not, however, mention to him anything about the allegations of sexual abuse

made by the children. She told no one until two months later when, on 21 April 1985, she told a neighbor, Mrs. Maurice.[4]

After Mrs. Hughes called the DSS on the 18th of April 1985, the interviewers visited with N the next day at his school. They asked no questions about sexual abuse because, up to that point, there had been no such allegation made. They found N to be dirty and unkempt. On Sunday (the 21st), Mrs. Green told Mrs. Maurice about the statements the children had made to her back in February, and Mrs. Maurice told Mrs. Hughes. Mrs. Hughes called the DSS again that day, relating the story told to her by Mrs. Maurice. On Monday, the DSS returned.

That day, Daphne Knight, Linda Justice, and a Naval Investigative Service (NIS) investigator came to Mrs. Schmitz's residence, where the children were being cared for, asking to speak to the children because "they [DSS] had a call that the children had been sexually abused." Mrs. Schmitz allowed the group to question A and D with the aid of anatomically correct dolls. The children were quiet and shy and made no statement concerning sexual abuse. The social workers and investigator then left to interview N. After learning that A and D had been interviewed by the DSS and had made no statements about any sexual impropriety by the appellant, both Mrs. Hughes and Mrs. Maurice approached the children. In the conversation that followed, A told the two women that the appellant "put his pee-pee in my mouth." Mrs. Hughes reported this conversation to the DSS. Later that day, Mrs. Schmitz summoned A, who had been playing outside and talking with Mrs. Hughes, back into the house to change into a swimsuit. As she was changing, A said to Mrs. Schmitz, "Do you know what daddy does?" A continued on to say that appel-

---

**3.** Mrs. Hughes testified that she decided to call the DSS after appellant bought the new car because, "He obviously had the money to take better care of them, but didn't." She told the DSS that neglect had been going on "for a long time."

**4.** The record reflects that Mrs. Green possessed an associate degree in social work which, according to her own testimony, gave her knowledge of all areas of social work, including child sexual abuse. She did not explain why she failed to report the allegation of sexual abuse earlier.

lant "put his pee-pee in my mouth and white stuff came out."

After leaving the Schmitz residence, Mrs. Knight, Mrs. Justice, and the NIS investigator interviewed N at his school. He was quiet and became particularly uncomfortable when the interviewers unclothed the dolls. He made no statement, however, concerning sexual abuse. The DSS group then contacted appellant and they visited with him. They told appellant about their suspicions of neglect and sexual abuse. Appellant denied that he neglected his children and apparently did not respond overtly to the allegation of sexual abuse.

At the DSS's request, appellant took the children to the base hospital where Dr. Stelmach, a staff pediatrician, examined them. The doctor found no sign of physical abuse and the children made no statements about sexual abuse to her. After the examination, Daphne Knight questioned them but only A responded. According to Mrs. Knight, "I kept asking her—I asked her at least three times [within a five-minute period] if she could tell me what her daddy had done that she didn't like." A finally responded that appellant "put his privates around her." [5] Shortly thereafter, the DSS obtained a court order granting the agency temporary custody of the children. They assigned Mrs. Earldean Futrell as the foster parent. While in her care, A and N made statements both that appellant had "peed" in each one's mouth and that he did not do anything at all.

During the course of the next five months, the children met on six occasions with Dr. Stack, a clinical psychologist, to be evaluated. They each met individually with him and, on at least one occasion, met as a group. During three of the individual sessions, N stated that appellant did not abuse him and he related the opposite in the three others. Likewise, A made similar allegations of sexual abuse on some occasions, but flatly denied that appellant did anything to her on others. D denied that anything improper happened until her last meeting with Dr. Stack, at which time she parroted the previous statements of the others, claiming that appellant "peed in her mouth."

At trial, the three children testified via closed-circuit television from a room adjacent to the courtroom. [6] D testified first. Trial counsel, using an anatomically correct doll as an aid, asked if the appellant ever did anything to her that she did not like. D responded, "He stuck his private in my mouth." [7] On cross-examination, she identified Mrs. Futrell as the person who encouraged her to testify, stating, "She told me to tell you all."

N was next to testify. When asked whether appellant ever did anything with his (appellant's) "pee-pee" that N did not like, he responded "No" and steadfastly refused to implicate his father in any sexual impropriety. Upon further prodding by the trial counsel, N stated, "I don't want to answer any more questions." Trial defense counsel was also generally unsuccessful in eliciting any more information from him.

A testified last. When asked whether the appellant ever did anything to her that she did not like, she shook her head "No." When trial counsel pointed to the groin area on the doll and asked whether appellant ever did anything with that part, she once again shook her head "No." Trial defense counsel, attempting to amplify on these responses, asked whether appellant had ever put his "pee-pee" in her mouth. She shook her head "No" and beyond that was generally uncooperative.

### RESIDUAL HEARSAY RULING

Trial counsel thereafter moved to allow Mrs. Hughes, Green, Maurice, Schmitz, and

5. Mrs. Knight testified that N confirmed the truth of A's accusations. (R. 2089).

6. The videotaped testimony of the children is attached to the record of trial as an exhibit and has been viewed by this Court.

7. The word "private," which was often used by the children to describe the male genitalia, is Mrs. Green's word, according to her testimony, and was apparently heard and adopted by the children.

Futrell to testify to the statements made to them by N and A. The military judge granted the motion, ruling that N and A were unavailable as witnesses and allowed in the testimony under Military Rule of Evidence (Mil.R.Evid.) 803(24).[8] Appellant contends that the military judge erred in this ruling.[9]

This case illustrates well the evidentiary difficulties inherent in a prosecution for the sexual abuse of very young children. It highlights the frequent clash in such cases between the accused's Sixth Amendment right to confrontation and the prosecution's need for substitute modes of proof when dealing with young children who are oftentimes not the most cooperative or willing witnesses. In justification of his ruling the military judge stated:

It is clear to me, as I have reviewed my own recollection and my notes as to that testimony, that these children were not willing witnesses. That is, they did not want to testify about anything. They didn't want—in particular, it's clear to me they did not want to make statements against their father. It is obvious to me that these children have a deep love for their father, they have a desire to return to their father. It's been made known to me throughout the proceedings that the children are aware that the father is in difficulty as a result of this, maybe even in jail as a result of this. It is clear from [N]'s testimony, he didn't want to answer any questions about his father.

\* \* \* \* \* \*

That's not to say that I am issuing any finding that the children were not being truthful in their testimony. That's not for me to decide; that's for the members to decide. It may be that the members will decide that the testimony that they have received via the closed-circuit television was the true statement of the children; that is, that their daddy didn't do it or it didn't happen, or whatever that exact testimony was. But it was also very clear to me that the children, again, did not want to talk about their father and the trial—the government was not afforded the opportunity to explore, through their testimony, the circumstances surrounding these alleged offenses.

Now, the age of these children, they're very young. The experts have told us that the least threatening environment that they would testify in the more likely we, or, the members would be to have the truth. We have taken as many efforts as we can to reduce that threatening or formal atmosphere under which they would testify. Yet, even under that less threatening environment, it was clear that they did not want to fully testify, that they were reluctant to be there, they didn't want to be there. They didn't want to talk about it, they just didn't want to be there—the climbing under the tables and so on.

R. 1570.

The military judge went on to rule that the statements made to the various witnesses were sufficiently reliable to warrant admission under Mil.R.Evid. 803(24).

Now, I'd like to address myself to the 803(24) exception. These children, again it's clear, they love their father, they

---

8. Mil.R.Evid. 803(24) excepts from the hearsay rule, A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the intention to offer the statement and the particulars of it, including the name and address of the declarant.

9. Government appellate counsel concedes, and we agree, that the admission of the testimony of Special Agent Nathan as to the statements made to him by the children constitutes error. *See United States v. Barror,* 23 M.J. 370 (C.M.A. 1987), and *United States v. Hines,* 23 M.J. 125 (C.M.A.1986).

want to be with their father, they don't want their father to be in trouble. They recognize the, and I find this as a fact, that they recognize that these statements they are making against their father all go against not only their proprietary interest, but the interest of their father as well. They are family members who love their father. Their statements made to these witnesses, GREEN and the others, are material and I find that they are more probative on point than any other evidence which can reasonably be obtained. And I specifically find that the admission would be in the best interest of justice.

I find these statements are highly reliable and they are necessary evidence. I find that the equivalent guarantees of trustworthiness do exist, that there is corroboration, that when these statements were given the kids' consciousness was heightened as to truthfulness.

R. 1571.

■ The military judge's ruling was in error. We first note that the precise basis for the military judge's decision to allow in the hearsay statements of the children is ambiguous. Although he stated that the hearsay testimony was admissible under Mil.R.Evid. 803(24), he also ruled that N and A were unavailable, which ostensibly is only a prerequisite for the admission of hearsay under Mil.R.Evid. 804(b)(5).[10] Mil.R.Evid. 804(a) defines unavailability and provides,

(a) *Definitions of unavailability.* "Unavailability as a witness" includes situations in which the declarant—

(1) is exempted by ruling of the military judge on the ground of privilege from testifying concerning the subject matter of the declarant's statement; or

(2) persists in refusing to testify concerning the subject matter of the de-

clarant's statement despite an order of the military judge to do so; or

(3) testifies to a lack of memory of the subject matter of the declarant's statement; or

(4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or

(5) is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subdivision (b)(2), (3), or (4), the declarant's attendance or testimony) by process or other reasonable means; or

(6) is unavailable within the meaning of Article 49(d)(2).

A declarant is not unavailable as a witness if the declarant's exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of the declarant's statement for the purpose of preventing the witness from attending or testifying.

In his ruling, the military judge specified that his finding N and A unavailable was premised upon their not being able "to testify fully." It is evident from the record, however, that the military judge used these words synonomously with not testifying against their father. His finding that N and A "did not want to make statements against their father" presupposed that their previous statements against appellant were in fact the truth. Indeed, all three children exhibited a timidity in testifying and the only substantive difference in their testimony was that D testified against her father while the other two did not.

■ We do note, however, that a witness can be declared to be unavailable for

---

10. This distinction can be critical. Where a declarant is unavailable, the Confrontation Clause requires a degree of reliability high enough so as to be an effective substitute for cross-examination. *See United States v. Hines, supra.* In cases where the hearsay declarant is available and subject to cross-examination, however, the same constitutional pressures do not

exist and the need for reliability of the hearsay is logically somewhat lessened although by no means is it lost. *United States v. Yeauger,* 24 M.J. 835, 837 (N.M.C.M.R.1987); *see also United States v. Renville,* 779 F.2d 430 (8th Cir.1985); *United States v. McPartlin,* 595 F.2d 1321 (7th Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979).

refusing to testify in the face of judicial pressure to do so. *See* Mil.R.Evid. 804(a)(2). Consequently, it may be that N and A became unavailable because of the difficulties encountered in eliciting their continued testimony.[11] However, we need not resolve the issue of whether the judge's ruling of unavailability was correct, because we find that, even assuming N and A became unavailable, their extra-judicial statements are not sufficiently trustworthy to warrant admission under either residual hearsay rule.[12]

In order for out-of-court statements to be admissible under the Confrontation Clause, it is preferable for face-to-face confrontation to occur at trial. *United States v. Hines*, 23 M.J. 125, 131 (C.M.A.1986); *see also United States v. Groves*, 23 M.J. 374, 377 (C.M.A.1987). Where the declarant is unavailable, however, the Confrontation Clause "countenances only hearsay marked with such trustworthiness that 'there is no material departure from the reason of the general [confrontation] rule.'" *Ohio v. Roberts*, 448 U.S. 56, 65, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 107, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1934)). The point of focus in determining whether a particular statement is sufficiently trustworthy is whether there are sufficient indicia of reliability to "afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement." *California v. Green*, 399 U.S. 149, 161, 90 S.Ct. 1930, 1936, 26 L.Ed.2d 489 (1970); *see also Hines, supra*, at 129. There is no mechanical test to make this determination; proper analysis requires balancing a variety of factors and circumstances on a case-by-case basis. *See United States v. Powell*, 22 M.J. 141, 145 (C.M.A.1986). In this re-

gard, the Court of Military Appeals has had ample opportunity to comment.

In *United States v. Hines, supra*, the appellant was charged with numerous sex offenses against his two daughters. The offenses were reported by Hines' wife, who walked in on him while he was sodomizing one of the girls. Subsequently, both Mrs. Hines and the daughters made a series of oral statements to law enforcement officials detailing appellant's sexual abuse of the victims. These statements were reduced to writing, sworn to and signed by each declarant. By the time of trial, however, a family reconciliation had taken place and neither appellant's wife nor his daughters would testify against him. The trial judge admitted the statements under Mil.R.Evid. 804(b)(5).

The Court of Military Appeals ruled that the statements were improperly admitted. While the statements were found to be generally reliable, the Court's primary concern was whether *ex parte* statements made to law enforcement officers are obtained with such a degree of bipartisanship so as to effectively serve the purposes of cross-examination. 23 M.J. at 137. Of central importance was the fact that after executing their initial statements to the police, the two victims made plainly inconsistent statements concerning the events in question to a military social worker. *Id.*

Similarly, in *United States v. Barror*, 23 M.J. 370 (C.M.A.1987), the Court ruled that in a prosecution for the sexual abuse of a 14–year-old boy, it was error to admit into evidence a signed and sworn statement made by the victim to the police shortly after the alleged incident occurred. The victim related to the police that his stepfather sodomized him and forced him to reciprocate. Evidence at trial revealed that

---

**11.** In this regard we note that during his testimony N specifically asked to take a rest and he became increasingly uncooperative when it appeared that the questioning would not stop despite his request. Similarly, A was very energetic and had a problem sitting still long enough to be questioned. Yet nothing was done by the military judge in this case to either accommodate N's wishes or to help A calm down. If more patience had been exercised in questioning these youngsters, perhaps the diffi-

cult problems facing the Court in this case would not have arisen. *Cf. United States v. Cokeley*, 22 M.J. 225 (C.M.A.1986) (in determining whether to admit a hearsay statement in place of in-court testimony, the military judge must weigh all facts and circumstances keeping in mind the preference for actual testimony).

**12.** *See* Mil.R.Evid. 803(24) and 804(b)(5).

semen found on the victim's pajamas could not have come from the victim but may have emanated from the stepfather. The victim refused to testify and the military judge admitted his earlier statement pursuant to Mil.R.Evid. 804(b)(5). The Court of Military Appeals found insufficient indicia of reliability to warrant the admission of the statement into evidence because there was no "meaningful basis for assessing the candor of the declarant or the accuracy of the statement." 23 M.J. at 372.

More recently, in *United States v. Dunlap,* 25 M.J. 89 (C.M.A.1987), a case factually similar to this case, the Court of Military Appeals reaffirmed the principles set forth in *Barror* and *Hines.* In *Dunlap* a young girl complained to a babysitter that her father had sexually abused her. The babysitter told the girl's mother about the statements, but the mother apparently did nothing to correct the situation. The babysitter continued to care for the child, and one night about 45 minutes after the child and her father departed from the sitter's house, the youngster "reappeared at [the sitter's] door with her hair sticking all out, big tears streaming down her face, and trembling, just frightened, really frightened." *Dunlap, supra,* at 90. The child informed the sitter about what happened after she left with her father. Shortly thereafter, the victim gave a written statement to an agent of the Criminal Investigation Command (C.I.D.) identical to the one given to the sitter. The military judge admitted the written statement under Mil. R.Evid. 804(b)(5), noting that the disheveled appearance of the victim and the excited nature of the initial complaints provided sufficient circumstantial guarantees of trustworthiness.

The Court affirmed, reasoning that the written statement made to the C.I.D. was reliable because it was identical to the excited utterance previously made by the declarant, and because excited utterances "themselves fall into that category of firmly rooted traditional hearsay exceptions such as may be deemed presumptively reli-

able for confrontation purposes." *Dunlap, supra,* at 91 (quoting *United States v. Hines,* 23 M.J. 125, 129 and n. 6 (C.M.A. 1986)); *see also Barror, supra,* at 372.[13]

■ Common to each of these cases is the requirement that where *ex parte* interviews are tendered without benefit of the right of confrontation, they must have been taken under such circumstances so as to satisfy confrontation values and serve as an effective substitute for cross-examination. In other words, there must be evidence presented showing the candor of the declarant and the truth of the statement to such a degree that the need for confrontation is made unnecessary.

In this case, appellate government counsel argues that the young age of the children coupled with their precocious knowledge of the sexual process lends to their statements sufficient reliability to justify admission untested by confrontation and he cites to *United States v. Dorian,* 803 F.2d 1439 (8th Cir.1986), *United States v. Cree,* 778 F.2d 474 (8th Cir.1985), and *United States v. Nick,* 604 F.2d 1199 (9th Cir. 1979), in support of that proposition. In *Dorian* and *Nick,* the courts relied to some extent on the young age of the child and the precocious knowledge of sexual matters in finding sufficient guarantees of trustworthiness to admit the child's hearsay statement under Rule 803(24). Critical to the rulings in each of those cases was the thought that it would have been highly unlikely for a child of tender years to fabricate such graphic allegations of sexual abuse. *See Dorian, supra,* at 1445; and *Nick, supra,* at 1204. In *Cree,* the young child was a victim of physical rather than sexual abuse. The court in that case, however, looked at the young age of the victim as being supportive of the credibility of the statement.

Although the reasoning embodied in this line of cases is equally applicable to this case, we decline to reach the same result for a number of reasons. First, in *Dorian, Cree,* and *Nick,* the young age of the child was but one of many indicia of reliability

---

**13.** The Court also relied upon the fact that the statement was made under oath and that "normal C.I.D. procedures were employed." *See Dunlap, supra,* at 91.

**770**

which also included, *inter alia,* evidence of physical trauma.[14] Second, the fact that the children in *Dorian* and *Nick* could graphically depict sexual acts was important in that there was no plausible explanation whatsoever to account for such knowledge except for their having experienced the act itself. In this case, however, there is evidence that appellant kept in his home a large collection of pornographic magazines and at least one film, some of which graphically depicted acts of oral sodomy and intercourse as well as the ejaculation of sperm.[15] Third, the reliability of the statements in this case is undermined by the fact that most of the babysitters and neighbors to whom statements were made held grudges of one sort or another against the appellant.[16] Fourth, beyond the initial statement to Mrs. Green, most all of the subsequent statements were *drawn from* the children by people who were all apparently operating under the implicit assumption that sexual abuse had indeed occurred and that appellant was the guilty party. Further, the statements made by the children were in no way consistent and ranged from appellant having sodomized them on

many occasions, to having only done it on one occasion, to having done nothing at all. Under these circumstances it cannot logically be said that such statements provide any meaningful basis for assessing the candor of the declarant, *see Barror, supra,* nor can it be said that they were obtained with such a degree of bipartisanship so as to serve the purposes of cross-examination. *See Hines, supra,* at 137.

While we have a keen appreciation of the problems encountered by the prosecution in this case, we find little in the many and varied out-of-court statements made by the children that suggests that they could pass constitutional muster as substitutes for Petty Officer Quarles' Sixth Amendment right to confrontation. Although the age of the victims and the detail of their statements adds an element of credibility thereto, there are far too many other factors which militate against a finding of sufficient indicia of reliability to lower the shield of the Confrontation Clause or to satisfy the reliability requirements of the rules of evidence and allow the admission of these statements.[17] Given the facts and

14. In *Dorian,* the court also relied on other facts to justify admission. First, that similar statements concerning the accused's abuse of the victim had previously been made by the victim's mother. Second, that the victim was terrified of being touched and was terribly afraid of the accused, and third, that the accused took furtive actions in an attempt to cover up evidence. *See* 803 F.2d at 1445. Likewise, in *Cree,* the victim had previously made identical statements to school health officials, and, perhaps more importantly, the instrumentalities of the abuse were found in the home of the accused. *See* 778 F.2d at 447. In *Nick,* the child's statement was made while still suffering from the pain of the abusive act. Further, there was ample physical corroboration in that sperm was found on the young child's clothing. *See* 604 F.2d at 1204.

15. We reach no conclusion as to how the children in this case gained such knowledge. The fact that the appellant had pornographic materials in his home is pertinent, however, to the determination of whether his right to confrontation should yield to the admission of the children's hearsay statements.

16. For example, Mrs. Green and Petty Officer Quarles had a dispute over thirteen dollars that Mrs. Green claimed appellant owed her son. After arguing with appellant about the debt,

Mrs. Green turned to her son and was heard to say, "He will end up paying more than thirteen dollars." R.1669. Similarly, Mrs. Hughes was especially insulted when Quarles traded in his old pick-up truck on a new car. She testified that, "I helped him on many occasions ... I did not expect anything in return. We've helped with the clothing, the Christmas, and I felt that when he bought the car and was standing there boasting about the car, I mean, like 'ha-ha look at me! Look what I got!' it was like he didn't care about the kids anymore. He obviously had the money to take better care of them, but didn't." R.1490. She further testified that the initial call to the DSS was made solely because of the purchase of the new car. R.1491. Similarly, Mrs. Maurice "blew up" when she noticed that Quarles had bought the new car because she thought that appellant should be spending more money on his children. She publicly confronted him when he brought the car home and testified that appellant "made her angry." R.1530.

17. We further note that none of the witnesses restricted their testimony to only those statements made by N and A, despite the ruling of the military judge that only the statements of those two youngsters were admissible under the residual rule. While it was clearly error for the witnesses to testify as to D's statements given

circumstances in this case, it simply cannot be said that the statements made by the children are trustworthy. *See Hines, Barror,* and *Dunlap,* all *supra.*[18] We conclude, therefore, that the military judge erred in admitting the testimony of Mrs. Hughes, Green, Schmitz, Maurice, and Futrell under Mil.R.Evid. 803(24).

### Mil.R.Evid. 803(4) RULING

■ We also find merit in appellant's contention that the military judge erred in allowing Dr. J. Thomas Stack to testify to statements made to him by the children during the course of psychological treatment.

Mil.R.Evid. 803(4) excepts from the hearsay rule "statements made for purposes of medical diagnosis or treatment and described medical history, or past or present symptoms, pain, or sensation, on the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Whether a statement is admissible under this rule depends on the state of mind of the declarant because the rule gains its validity from the premise that a patient seeking diagnosis or treatment from a doctor will tell the truth because it will facilitate the doctor's task of treatment. *United States v. White,* 25 M.J. 50, 52 (C.M.A. 1987); *United States v. Nelson,* 25 M.J. 110, 112 (C.M.A.1987); *United States v. Deland,* 22 M.J. 70, 72 (C.M.A.1986).[19] Such statements are deemed to be inherent-

ly reliable and, hence, admissible under the rule. *White, supra,* at 51; *Deland, supra,* at 75.

In this case, the DSS sent the children to Dr. Stack on 21 May 1985 and he met with them on six occasions individually and on one occasion as a group, the last interview being on 3 September 1985. During this series of interviews, each of the children made statements incriminating the appellant; however, each child also told the doctor that appellant did not do anything to them. The record reflects that on at least three occasions N. told Dr. Stack that appellant did not do anything. A said the same thing during at least two of the meetings. Similarly, D denied that anything happened until her last meeting with the doctor when she essentially parroted the complaints of her brother and sister, claiming that appellant "peed in her mouth."

At trial, defense counsel moved *in limine* to exclude Dr. Stack's testimony. Defense counsel claimed that the sessions with the Quarles children were oriented towards the doctor's testifying at trial rather than to medical treatment and he also argued that the children had made inconsistent statements to the doctor during the course of their interviews. The military judge admitted the statements, ruling that the interviews by Dr. Stack were conducted for a valid medical purpose, although the children did not fully understand the nature of the visits.[20]

this ruling, we find that her statements could properly have been admitted pursuant to Mil.R. Evid. 801(d)(1) to rebut the express inference made by trial defense counsel that her testimony was the result of a recent fabrication or improper influence.

18. While we find that the statements were not made under circumstances that would allow untested admission into evidence, trustworthiness is further undermined by a number of factors that merit attention. First, the defense in this case was given but one very limited opportunity to speak to the children prior to trial, while the prosecution attorneys enjoyed unlimited access. Second, the military judge denied defense requests to depose the children and to have the children examined by their own expert psychiatrist. Third and most disturbing is the fact that none of the babysitters and neighbors to whom the children made state-

ments would speak to the defense; in fact, the trial counsel even went so far as to tell Mrs. Schmitz that it would be better if she did not talk to the other side. R. 609. *See United States v. Hyatt,* 565 F.2d 229 (2d Cir.1977); *IBM Corporation v. Edelstein,* 526 F.2d 37 (2d Cir.1975). In short, the defense was given very little opportunity to test the validity of the children's statements prior to trial. ----

19. Statements made to a psychologist are acceptable under the Rule. *United States v. Welch,* 25 M.J. 23 (C.M.A.1987).

20. The military judge made the following ruling:

MJ: Your motion for appropriate relief on the hearsay evidence, the medical diagnosis, is denied, Defense. The ruling that I have just issued is based upon the following essential findings of fact:

Appellant argues that the Court of Military Appeals decision in *United States v. Deland, supra,* is determinative. In *Deland,* the accused sexually abused his seven year-old-daughter. The victim's mother took her to a pediatric psychiatrist after the child complained about her father's misconduct. According to the mother, the motivation for the visit was partly because of a desire to ascertain the truth of her daughter's accusations and partly because of concern over the girl's recent anti-social behavior and persistent nightmares. 22 M.J. at 72. During the visit, the victim told the doctor that the appellant had placed his penis inside her vagina and had also orally sodomized her. The doctor testified at trial to these statements over defense objection, and the Court of Military Appeals held that the statements were properly admitted under Mil.R.Evid. 803(4). The Court stressed that the declarant's state of mind when making the statement is the key to a determination of admissibility, and it identified a number of foundational requirements that must be satisfied prior to admitting a statement under the rule. First, the statements made must reasonably relate to a medical diagnosis or treatment. Second, the statement must have been "clearly made" with some expectation of receiving medical benefit from the treatment being sought. Third,

the military judge "must determine that the statements were elicited under circumstances which made it apparent *to the patient* that the [doctor] desired truthful information and that only by speaking truthfully would he receive the desired benefits of the consultation." 22 M.J. at 73 (emphasis added). The Court warned that such evidence should be received with great caution by a military judge. The Court concluded that the victim's statements in that case were admissible because, "Stephanie herself testified that she went to see [the doctor] because she was having nightmares; and she knew that she was going to talk to the doctor about them." 22 M.J. at 73.[21]

This case, however, presents a situation different from *Deland* and dictates an opposite result because of the complete lack of proper foundation for the admission of the children's statements. While the military judge did find that both the DSS and Mrs. Futrell had a valid medical purpose for seeking treatment, his ruling admitting the statements overlooked the requirement that the point of focus in a Mil.R.Evid. 803(4) analysis is the subjective view of the declarant. This record fails to demonstrate that the children knew why they were taken to Dr. Stack or that their truthful answers to his questions were necessary for

It is my finding that Dr. STACK is a psychologist and an expert in the field of child psychology; that Dr. Stack was requested by the Department of Social Services to clinically evaluate the QUARLES children—that's all three of the children—that Dr. STACK did clinically evaluate the QUARLES children on numerous occasions for medical purposes; that Dr. STACK'S interviews of the children was for the primary purpose of taking a medical history of any sexual abuse rendering a medical diagnosis and providing treatment as necessary. More specifically, I find that such evaluation and diagnosis was for the purpose of medically treating, for psychological problems, the QUARLES children, for the psychological type problems that they were experiencing while under the care of Mrs. FUTRELL; that Dr. STACK actually treated the QUARLES children for emotional problems related to sex abuse; that the children were too young to fully understand the nature or purpose of their visits with Dr. STACK—and I stress the word "fully" understand.

However, I also find that the Department of Social Services and the foster mother fully understood the medical nature of the children's visits with Dr. STACK, and arranged for such visits for medical purposes which benefitted the children. I further find that the statements made to Dr. STACK concerning sexual abuse were made pursuant to and necessary for the treatment of the QUARLES children; the statements made to Dr. STACK identifying the accused as the perpetrator of the sexual abuse, was necessary and relevant to the treatment. Therefore I find the statements made to Dr. STACK concerning sexual abuse and the identity of the accused as the perpetrator, are admissible under Military Rule of Evidence 803(4).
R.910–11.

21. The court also found that the psychiatrist's questions concerning the identity of the perpetrator were reasonably related to the victim's medical treatment. 22 M.J. at 72.

their treatment.[22] The children did not testify about this issue and no other testimony was elicited concerning the children's states of mind. Additionally, our concern that the children did not know they were being treated by Dr. Stack is supported by their contradictory answers to his questions and by the military judge's specific finding that the children did not "fully" understand the reasons for the visits.[23]

Government counsel urges that this Court adopt a flexible reading of *Deland* in order to accommodate the fact that young children will often not recognize the underlying purpose for a visit to a doctor. He argues that the better approach would be to determine whether the child declarant perceives the doctor as being a "disinterested friend" to whom he or she can tell the truth, and he suggests that the Court of Military Appeals in *Deland* may have "somewhat overstated the case in the interests of clarity." [24] We reject this argument. The Mil.R.Evid. 803(4) hearsay exception gains validity solely from the fact the patient is motivated to tell the truth in order to be healed. *United States v. White, supra* at 51; Weinstein & Berger, *Weinstein's Evidence,* 803(4)[01], p. 803–144.

We recognize this rule excludes from consideration some statements made by young victims of sexual abuse and we are not unaware of the problems noted by appellate government counsel in trying to adapt the rule to situations where the declarant may be too young to form the requisite state of mind. We see nothing, however, in either the rule itself, the *Deland* opinion, or other more recent decisions of the Court of Military Appeals that suggests the rule should be relaxed in such cases.[25]

### PROSECUTION ARGUMENT

Appellant further contends that the trial counsel's closing argument to the members was improper and denied him a fair trial in that, *inter alia,* it was calculated to portray the appellant as a sexual deviant because he possessed sexually explicit literature and artifacts. Appellant's attack on the trial counsel's argument encompasses two different legal theories. First, that the closing argument tended to inflame the passions of the jury, thus swaying them from their role as objective fact finders; and second, that, in the argument, the trial counsel used evidence previously admitted for a limited purpose in an improper manner. We find merit in both theories.

A prosecutor may comment earnestly and forcefully on the evidence as well as the inferences which reasonably may be drawn. Inferences must be fair comment

---

22. We note that even had the children specifically understood the underlying medical purpose for their visit to Dr. Stack, a different result would not necessarily ensue because of the contradictory nature of the statements themselves. Since Rule 803(4) assumes that the patient is telling the truth to the doctor in an effort to be healed, it is logically undermined where the patient vacillates between two opposite stories, one of which is untrue.

23. Although there is no requirement in the Rule that the declarant "fully" understand the nature of the visit to the doctor, it is required that the declarant's "primary" motivation to make the statement is "the desire to obtain a medical benefit." *See United States v. White,* 25 M.J. 50, 53 (C.M.A.1987) (Everett, C.J., concurring).

24. Government Brief at 37.

25. In *United States v. White,* 25 M.J. 50 (C.M.A. 1987), the Court admitted statements made by two young children to a psychologist under Mil.R.Evid. 803(4) where "the children's overwhelming motivation for visiting and speaking with [the doctor] was to receive treatment in order to overcome the bed-wetting episodes, the unnamed fears, the crying, and other psychological problems they experienced." 25 M.J. at 52. In both *United States v. Welch,* 25 M.J. 23 (C.M.A.1987), and *United States v. Nelson,* 25 M.J. 110 (C.M.A.1987), the Court allowed the use of statements made by sex abuse victims to doctors where there was no evidence of record that the victim's motivation to speak to the doctor was anything other than a patient's responding to a doctor's questioning for treatment. *Welch,* 25 M.J. at 26; *Nelson,* 25 M.J. at 112. In this case, however, the military judge's ruling, the nature of the children's responses to the doctor's questions, and the absence of proper evidentiary foundation indicate that the children had no understanding whatsoever concerning why they were being interviewed by Dr. Stack. In any event, we do not view either *Nelson* or *Welch* as presaging any significant departure from the foundational requirements set forth in *United States v. Deland, supra.*

on the evidence and not akin to the presentation of wholly new evidence or impermissible extensions of evidence already received. *See* Mil.R.Evid. 403; *United States v. Redmond,* 21 M.J. 319, 326 (C.M.A.1986); *Woodruff v. Lane,* 818 F.2d 1369 (7th Cir. 1987); *United States v. Radtke,* 799 F.2d 298, 310 (7th Cir.1986); *United States v. Doyle,* 771 F.2d 250, 258 (7th Cir.1985). Further, a prosecutor cannot inject inflammatory arguments which tend to inflame passions rather than provide a reasoned, objective basis for a decision. *United States v. Clifton,* 15 M.J. 26 (C.M.A.1983); *United States v. Shamberger,* 1 M.J. 377 (C.M.A.1976). The rationale behind this rule is clear—an inflammatory argument aimed simply at arousing passions deludes the members from their duty to resolve the issues on reasoned consideration of the evidence presented and instead appeals only to emotions and prejudice. *See United States v. Nelson,* 1 M.J. 235 (C.M.A.1975); *United States v. Wood,* 18 U.S.C.M.A. 291, 40 C.M.R. 3 (1969); *Shamberger, supra* at 379.

■ During this trial, the prosecutor introduced various items of evidence found in appellant's home after his apprehension by military authorities. Among the items admitted were a tube of lubricating gel (labeled "Lusty Licks"), a box containing various sexual aids, a pornographic film, evidence of a telephone number on the wall alongside appellant's bed (which number produced a sexually-oriented message), and testimony that appellant kept pornographic magazines in his house as well as a jar of Vaseline on his night table. The military judge admitted this evidence "for the limited purpose of its tendency, if any, to show the accused's consciousness of guilt or you may consider this evidence for the limited purpose of its tendency, if any, to establish the alleged victim's knowledge of sexually explicit acts." In his closing arguments on findings, the trial counsel made, in part, the following argument.

Why does he hide "Lusty Licks," talk about these books that he had, hard-core pornography? Why does he lie about it? We're going to tell you why. *Because he's prurient. He's obsessed with matters of a sexual nature. He's obsessed with this. He's—the term might be a "deviate," a "sex fiend," whatever, but he is obsessed with matters of a sexual nature, and it extends from just the soft-core pornography he had to the actual sodomizing and rape of the children.*

Let me explain a little bit more. *These —this pornography gives validity to the children's statements. That's why he's got to lie about it. It validates the kids' statements. He knows, by being caught with this stuff, the kids' statements are valid.* He knows in his mind what the importance of this evidence is, so he tries to get rid of it. He did get rid of it. Wouldn't you like to know what was really in those magazines? He's saying it was just all—all adults, but we have other testimony that there are some other things in magazines that he had. He knows it. He knows his magazines and this stuff is incriminating him—will incriminate him, and he tries to get rid of it. He's trying to buffalo you. Now, these—it identifies him for what he is, this type of stuff.

Now, the accused—take a look at his interest in sexual material. He's married—he was married. He produced children. His wife testified as to maybe once or twice a month, nothing more, nothing unusual, very conventional sex life. *Somewhere, the accused got a penchant for deviant sex. Who knows where? But somewhere, something snapped. Something broke.* All of a sudden, according to Mrs. DAUM, there's books in his room that depict soft—soft-core magazines, hard-core, group sex, anal sex, oral sex, old men and teenagers, bondage, and even a picture of a little boy, but she didn't want to go into that. And then this phone sex number. *The individual is into deviant sex. He's into sex very deeply, and*

*there's no outlet. The kids are the outlet. It's not a graph—one of the experts was questioned—you don't wake up in the morning and decide, "Today's the day I'm going to put my penis in my son's mouth or my daughter's mouth."* No. A very gradual thing. And the accused—his marriage—his marriage failed. Alcohol is involved. Single parent. You can see the stress of his job. And then this interest in sex through these magazines. *What's he doing exchanging these books with a lance corporal?* Some lance corporal said that he didn't see any pictures of boys. *What's he doing—an E-6 and a Marine lance corporal, exchanging dirty books. The man is very interested in deviant sex, and the sex with his children is but a subset of his deviance. His children are a physical outlet for his internal desires for sexual fulfillment.*

You'll see—you've heard the testimony—and what's in that box, and it's "Lusty Licks"—"Lusty Licks"—*deviant is the key, deviant sexual activity, not conventional, children sex, deviant, bondage, deviant. These are all deviant forms of sex. What happened to his kids are but one subset of the deviant sex of which he—of which he's interested in.*

R.2331 (emphasis added).

This argument could not have been better calculated to arouse anger and emotion and to thereby undermine the duty of the members to rationally evaluate the evidence.[26] By characterizing the appellant as a prurient sex fiend and a deviant pervert,

trial counsel urged the members to cast aside reason and exhorted them to make the quantum leap of logic from viewing the appellant as a possessor of pornographic items to being a child sodomizer. We fail to see how possession of sexual aids and erotic magazines equates with being a sex fiend or deviant much less having any probative value as to whether appellant committed the specific acts alleged. *See United States v. Long,* 17 U.S.C.M.A. 323, 38 C.M.R. 121, 125 (1967); *see also Handford v. United States,* 249 F.2d 295 (5th Cir. 1957); *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Furthermore, even assuming *arguendo* that the evidence marginally implies that appellant is obsessed with sex, using the term "deviant" ten times in the space of not more than a minute of argument can serve no purpose but to inflame the passions of the members. *See United States v. Redmond, supra.*[27]

■ We further agree with appellate defense counsel's assertion that the trial counsel's argument concerning the tube of "Lusty Licks" gel was improper as well as inflammatory. The gel was admitted to show the appellant's consciousness of guilt because, when he was escorted to his home by security personnel prior to being incarcerated, he picked up the tube off the floor of his bedroom (in full view of his escort) and put it into his dresser drawer.[28] There was no testimony concerning if or how the gel was used by the appellant or, for that matter, how the gel was intended to be used. Yet, trial counsel speculated,

26. *United States v. Gerlach,* 16 U.S.C.M.A. 383, 37 C.M.R. 3 (1966) (improper argument by trial counsel requires corrective action where there is a fair risk that the argument had any effect upon the members). We note that the military judge did, upon the conclusion of the prosecutor's argument, caution the members that the argument exceeded the narrow parameters under which the various items of evidence were admitted. We find, however, that this instruction was too little and too late to remedy the error. *See United States v. Clifton,* 15 M.J. 26 (C.M.A.1983).

27. A prosecutor may not excite the passions of the factfinders by evidence which, even if otherwise admissible, is unduly inflammatory. *See Redmond, supra,* at 326.

28. HMC Herman, who escorted appellant during the visit to appellant's home, testified that while appellant did pick up the tube and place it into his dresser drawer, he in no way tried to hide it from him or otherwise conceal its presence. R.1252.

Another interesting aspect of Petty Officer QUARLES is this "Lusty Licks", and its in front of the president right now, and you can take that into deliberations. The Government counsel would invite your attention to that item. And you've heard Petty Officer QUARLES's explanation of how—very detailed—how he got this—this item. Of course, that can't be checked out as to how he got it—some contest. You get $20 worth of porn for trying to win a car. He's asking you to believe that, that that came from some contest, and even if it did come from some contest, he kept it. He said he tasted it, and it tasted bad, but he still kept it. And it just happened to be in the bedroom of his house, where his children talk about some of these events occurring. *And you'll see what the intent of that object is, "Lusty Licks". It's for oral sex. What better vehicle to get a child to do something than something that tastes good or some type of stimuli for a child.*

R.2328–29 (emphasis added).

The insinuation made is clear—appellant used the "Lusty Licks" to get his children to perform oral sex upon him. This argument clearly exceeded the limited purpose for which the evidence was admitted. Instead of focusing on appellant's purported attempt to conceal the gel as proof of his guilty state of mind, trial counsel attempted to persuade the members that mere possession of the gel proved that appellant committed sodomy with his children. There is simply no such inferable connection. *See Clifton, Nelson, Shamberger, Long,* and *Handford,* all *supra.* The prejudice to the appellant is clear; given the nature of the charges, the tender ages of the children, and the paucity of corroborating evidence, "any unfair argument or prejudicial appeal would affect a juror's thinking." *Handford v. United States, supra* at 298. *See also United States v. Gerlach, supra.* It is especially true that in cases such as this, involving allegations of abuse of young children, that improper sugges-

tions, insinuations, and comments by the trial counsel are apt to carry much weight when they should properly carry none. *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935).

But yet another problem raised by this assignment of error gives this Court additional concern about the basic fairness of appellant's trial. We find the prosecutor's theory of the case most disturbing in that it advocated appellant's conviction based on his criminal propensity. We fear that this appellant may have been convicted because he kept a dirty house and was not a model parent to his children. From the prosecutor's opening statement and through to closing argument, the government case against the appellant was predicated upon an array of irrelevant and prejudicial evidence which served to portray the appellant as a bad parent whose interest in sex and whose less than perfect parenting and housekeeping abilities made it more likely than not that he sodomized his children.

It is axiomatic that evidence of prior bad acts cannot be introduced to show a defendant's bad character or propensity to commit the crime charged. *United States v. Hicks,* 24 M.J. 3 (C.M.A.1987); *United States v. Rappaport,* 22 M.J. 445 (C.M.A. 1986); *United States v. Peterson,* 20 M.J. 806 (N.M.C.M.R.1985); *United States v. Lau,* 828 F.2d 871 (1st Cir.1987); *United States v. Hogue,* 827 F.2d 660 (10th Cir. 1987); *United States v. Everett,* 825 F.2d 658 (2d Cir.1987). Prior to admitting evidence of bad acts, the trial court must ascertain whether the evidence offered has some particular relevance, and must then weigh the probative value of the evidence against the danger of unfair prejudice to the defendant. *United States v. White,* 23 M.J. 84, 87 (C.M.A.1986); *Lau, supra; United States v. Shoffner,* 826 F.2d 619, 633 (7th Cir.1987); *Everett, supra* at 661.

In his opening statement, this trial counsel began by telling the members,

There have been neglect complaints ... that these children were improperly cared for ... that they are not being fed

properly, or clothed properly, the standards of being clean were among these concerns ... The children were often seen or observed dirty—their hair very dirty, smelled frequently, unchanged underwear. The living conditions in the house were squalorous.
R.1140.

In addition, he pointed out that the children "ate cereal ... or maybe an apple" for their supper, and further stressed that while there was very little corroborating evidence, various sexually oriented items were found in appellant's quarters including a film, sexual aids, "Lusty Licks", and twenty or more pornographic magazines which showed "graphic illustrations of consenting adults in copulation and oral sex, etc."

During the case-in-chief, the babysitters and neighbors testified at length about the squalid living conditions in the Quarles' home and expressed their anger at the appellant for his apparent inability to better care for the children. Mrs. Daum testified as to the pornographic materials found in the house and the fact that appellant kept Vaseline near his bed and a telephone "sex message" number on his bedroom wall. Further, when appellant took the stand to testify in his own defense, trial counsel cross-examined him about the presence of the pornographic magazines and sexual aids, the claim that he did not properly feed and clothe or spend enough money on his children, the neighbors' observations that his children were frequently dirty and often not appropriately dressed, his buying a new car, and that he kept a bottle of scotch and a container of cough syrup in his house. The presentation came full circle for the members when the trial counsel, in his closing argument, pointedly remarked that the appellant's interest in sexual matters "extends from just the softcore pornography he had to the actual sodomizing and rape of the children."

■ Although the military judge was specific in admitting most of the bedroom evidence for the limited purpose of showing appellant's consciousness of guilt, the trial counsel conceived, executed and argued a theory of guilt predicated on an impermissible attack of appellant's general character and specific traits for parenting and sexual preference in order to show that he acted in conformity therewith. See Mil.R.Evid. 404(a) & (b); United States v. Rappaport, supra. These items of evidence simply had little or no relevance in proving whether the appellate sodomized his children and, even if some of the evidence was marginally relevant, it was plain error not to have excluded it under the provisions of Mil.R.Evid. 403 as being more prejudicial than probative. See United States v. Fisher, 21 M.J. 327 (C.M.A.1986); Redmond, supra.

## RESOLUTION

We have no doubt that the errors discussed infra had a significant effect, if not a profound effect, on the resolution of the factual issues by the court members below. The appellant was prejudiced thereby and the guilty findings must be set aside. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); United States v. Remai, 19 M.J. 229 (C.M.A.1985); United States v. Barnes, 8 M.J. 115 (C.M.A.1979); United States v. Starr, 1 M.J. 186 (C.M.A.1975); United States v. Ward, 1 M.J. 176 (C.M.A.1975).

In weighing my responsibilities under Article 66(c) and (d), 10 U.S.C. §§ 866(c) and (d), with respect to this case, I would dismiss all of the charges because the remaining admissible evidence in the record is insufficient to convince me of appellant's guilt beyond a reasonable doubt. My brother judges, however, believe that D's unrecanted testimony is a sufficient basis to authorize a rehearing as to that single charge and specification.

Accordingly, the findings of guilty and the sentence are set aside. Charge I and its sole Specification as well as Specifications 1 and 3 of Charge II are dismissed.

**778**

A rehearing is authorized on Charge II and Specification 2 (as modified by the approved finding of guilty by the convening authority below) or, in the alternative, that charge and modified specification shall be dismissed by an appropriate convening authority. The record is returned to the Judge Advocate General of the Navy.

Senior Judge COUGHLIN concurs.

Judge DECARLO concurs in the result.*

---

* Judge DeCarlo participated in the more than six hours of oral argument in this case as well as the subsequent panel conferences in which the merit of the assignments of error was discussed and resolved. He concurred in the result reached, but he detached from this Court prior to completion of the written opinion. Subsequent judges assigned to this panel did not participate in the resolution of this case.